**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

|  |  |
|---|---|
| ELIZABETH JANE SINNER, WHITNEY OXENDAHL, CAROL SAWICKI, LOIS ALTENBURG, and NORTH DAKOTA VOTERS FIRST,<br><br>*Plaintiffs,*<br><br>v.<br><br>AL JAEGER, in his official capacity as Secretary of State of North Dakota,<br><br>*Defendant.* | Case No. _____ |

**COMPLAINT**

Plaintiffs Elizabeth Jane Sinner, Whitney Oxendahl, Carol Sawicki, Lois Altenburg, and North Dakota Voters First (collectively, "Plaintiffs"), for their Complaint against Defendant Alvin A. Jaeger, in his official capacity as North Dakota Secretary of State ("Defendant"), state and allege as follows:

**INTRODUCTION**

1.      North Dakota requires that a person circulating a petition personally witness all signatures on the petition and remain in physical control of the petition at all times. The circulator must swear that they have complied with these requirements before a Notary Public. North Dakota also dictates that petitions may not be signed electronically. Due to the COVID-19 pandemic, North Dakota's in-person signature requirements are not only unrealistic and difficult, they are dangerous. In this lawsuit, Plaintiffs seek a ruling that, due to the unique nature of the COVID-19

pandemic, the state may not bar them from collecting signatures for their proposed constitutional amendment by reliable and secure electronic means.

2.     North Dakota's requirements to place a constitutional amendment on the ballot have become dangerous and unnecessarily difficult to satisfy in light of the COVID-19 pandemic and the restrictions imposed to address it.  Specifically, North Dakota law requires close in-person contact between circulators, electors, and notaries public—the type of contact that counters federal and state guidelines and recommendations and is ill-advised due to COVID-19. The challenged procedures result in a severe burden that effectively deprives Plaintiffs of their opportunity to propose a constitutional amendment eliminating partisan gerrymandering until after the 2030 census. As a result, Plaintiffs are forced to choose between foregoing their right to place a constitutional amendment on the ballot or complying with petition requirements that create an unnecessary and potentially lethal situation involving thousands upon thousands of close personal interactions during a pandemic. Plaintiffs seek relief in this Court to alleviate the unconstitutional burden these requirements impose on their rights under the First and Fourteenth Amendments as applied to them during the COVID-19 pandemic.

3.     Plaintiffs became eligible to begin gathering signatures for their petition to add a new section and amend Article IV of the North Dakota Constitution (the "Proposed Amendment") on Thursday, April 30, 2020. The Proposed Amendment would (1) require ballots to be transmitted to qualified military-overseas electors by the sixty-first day before an election; (2) require that all voting machines produce a paper record of each vote cast and require a random audit of election results; (3) establish a new process for open primary elections using instant runoff voting; and (4) create impartial legislative redistricting.

4.      Plaintiffs were instructed by Defendant that a "circulator must personally witness the signature applied to the petition by each qualified elector who signs the petition. The petition must remain in the physical possession of the qualified North Dakota circulator[.] . . . A petition left unattended is an improperly circulated petition and is not counted. . . . An affidavit is on the last page of each petition whereby the circulator is required to swear (or affirm) before a notary public that he or she circulated the petition in the manner required by state law and <u>that he or she witnessed each signature applied to the petition by a qualified elector</u>."[1] The COVID-19 pandemic makes it dangerous to comply with those requirements.

5.      Plaintiffs seek to place the Proposed Amendment before North Dakota electors in the November 3, 2020 general election. Plaintiff North Dakota Voters First ("NDVF") already has expended considerable effort and money in preparation for the petition drive to place the Proposed Amendment on the ballot. NDVF, its members, and the individual Plaintiffs would expect significant progress in gathering petition signatures beginning this week were it not for the COVID-19 pandemic and the restrictions imposed to address it.

6.      Moreover, it is crucial to Plaintiffs that the Proposed Amendment appear on the ballot in this election cycle. Because the Proposed Amendment impacts the redistricting process that follows the census, Plaintiffs cannot simply put the Proposed Amendment on the ballot in the 2022 election cycle. If Plaintiffs cannot get the Proposed Amendment on the ballot in the 2020 election, the next opportunity to create the change Plaintiffs seek will come *after a* new state legislative map is drawn in 2021, effectively delaying redistricting reform until after the 2030 census.

---

[1] Letter from Alvin A. Jaeger to Carol M. Sawicki 1 (Apr. 30, 2020) (underlining in original).

7.     In lieu of the in-person collection of "wet" signatures, which requires close, in-person interactions, Plaintiffs could gather the necessary signatures electronically. Permitting secure and verifiable electronic signatures would allow Plaintiffs to meaningfully participate in the ballot initiative process, would protect the public from the further unnecessary spread of COVID-19, and would sufficiently guarantee validity of electors' signatures.

8.     Given the severe restrictions on and the danger inherent in physically interacting with others, North Dakota's requirements that petition circulators gather wet signatures in person and have petitions notarized unduly burden Plaintiffs' fundamental First and Fourteenth Amendment rights under the U.S. Constitution.

## PARTIES

9.     Plaintiff Elizabeth Jane Sinner is a resident, eligible elector, and regular voter in the State of North Dakota who wants to sign the petition in support of the Proposed Amendment. Due to health concerns, Ms. Sinner must adhere to guidance issued by the CDC and North Dakota Department of Health and maintain a distance of at least six feet from all people at all times. As a result, it would be burdensome for her to sign the petition in support of the Proposed Amendment and comply with the North Dakota petition requirements governing constitutional amendments. Plaintiff Sinner lives in Fargo, Cass County.

10.     Plaintiff Whitney Oxendahl is a resident, eligible elector, and regular voter in the State of North Dakota who wants to serve as a circulator for the Proposed Amendment. Plaintiff Oxendahl lives in Fargo, Cass County.

11.     Plaintiff Carol Sawicki is a resident, eligible elector, and regular voter in the State of North Dakota who wants to serve as a circulator for the Proposed Amendment. Plaintiff Sawicki also wants to recruit others to volunteer as a circulator for the Proposed Amendment. However,

due to COVID-19, Sawicki believes official orders, recommendations, and the widespread public anxiety will make people reluctant to volunteer as circulators and electors reticent to sign the petition. Plaintiff Sawicki lives in Fargo, Cass County.

12.     Plaintiff Lois Altenburg is a resident, eligible elector, and regular voter in the State of North Dakota who would like to sign the petition in support of the Proposed Amendment, and to witness her husband's signature on that petition, but due to her husband's severe health conditions, Plaintiff Altenburg and her husband are practicing social distancing and have stayed out of contact with people entirely since mid-March. Plaintiff Altenburg is on the sponsoring committee for NDVF, is a spokesperson and honorary chair of the NDVF campaign. It would be burdensome for Plaintiff Altenburg to sign the petition in support of the Proposed Amendment in the presence of a third-party circulator. Further, it would be burdensome to witness her husband's signature as a circulator and then have her circulator's affidavit notarized in compliance with the North Dakota petition requirements governing constitutional amendments. Plaintiff Altenburg and her husband live in Fargo, Cass County.

13.     Plaintiff North Dakota Voters First ("NDVF") is a North Dakota sponsoring committee responsible for the organization of the signature-gathering effort to certify the Proposed Amendment to the November 3, 2020 general election ballot, and to support its passage by North Dakota electors. NDVF will engage in signature collection in Fargo among other locations.

14.     Defendant Alvin Jaeger is the North Dakota Secretary of State and the chief elections officer in the State of North Dakota and is charged under the North Dakota Constitution with receiving filed petitions and determining the sufficiency of signatures.

## JURISIDCTION AND VENUE

15.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

16.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

17.     This Court has personal jurisdiction over Defendant, Secretary of State Alvin Jaeger, who is sued in his official capacity only.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim have occurred in this district. Plaintiffs Oxendahl, Sawicki, Altenburg, and Sinner reside in this district and wished to collect or sign petition signatures in this district. Plaintiff NDVF planned to gather signatures in this district and was about to launch its signature-gathering operation in the district before the COVID-19 pandemic forced them to halt their preparations. Pursuant to D.N.D. Civ. L.R. 3.1, assignment to the Eastern Division is proper. This action arose in the Eastern Division because Plaintiffs' rights are being violated in that Division.

19.     This Court has authority to enter declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

### *North Dakota Voters First Has Worked Diligently to Place the Proposed Amendment on the November 3, 2020 General Election Ballot*

20.     Plaintiffs are proponents of the Proposed Amendment to North Dakota's Constitution, which is designed to ensure independent nonpartisan redistricting; establish open, non-partisan primaries; enact ranked choice voting; require that voting machines produce a paper

record; require an audit of election results throughout the state; and expand the time for military overseas voting. These measures are intended to provide people with greater opportunities to participate in the democratic process and to foster greater confidence in North Dakota elections.

21.     Since its formal establishment as a 501(c)(4) corporation in February 2020, NDVF has used resources to hire consultants and seek legal advice. Additionally, NDVF has spent significant time planning its strategy to collect signatures and was preparing to establish a full network of volunteer petition circulators until the COVID-19 crisis halted their efforts.

22.     On March 6, 2020, Plaintiff NDVF submitted its petition to the Secretary of State for review and approval for circulation. This submission included the names and addresses of the sponsoring committee and the full text of the Proposed Amendment.

23.     On March 17, 2020, the Secretary of State provided NDVF with the petition title along with a listing of corrections for the petition's format.

24.     On April 29, 2020, NDVF returned the petition to the Secretary of State for review.

25.      On April 30, 2020, the Secretary of State approved the petition for circulation, marking the beginning of the period in which NDVF was permitted to gather signatures.[2]

26.     As discussed *infra*, by this point—April 30, 2020—the Governor had already issued an executive order declaring a state of emergency, shut down businesses, and barred large gatherings as part of the comprehensive measures by the State to mitigate the effects of the pandemic. Since then, the Governor has partially lifted some measures, but the impact of COVID-19 remains pervasive. Even as some businesses may resume limited operations, others will not.

---

[2] Timeline for Constitutional Initiative Relating to military and overseas voters, election audits, open primaries, instant runoff elections, legislative redistricting, and subdivision of House legislative districts,
https://vip.sos.nd.gov/pdfs/Measures%20Info/Petitions%20Being%20Circulated/11%20Timeline%2030Apr20.pdf

Those businesses that can resume operations are subject to social distancing and occupancy requirements. Further, it is unclear whether and when the general public will feel comfortable with in-person signature gathering, and is likewise unclear when petition circulators and signers will no longer face exposure to a dangerous and novel virus while exercising their rights.

27.     Furthermore, redistricting in North Dakota will occur in 2021, following the decennial census. Thus, in order to reform the redistricting process before the new map is drawn, the Proposed Amendment must be on the November 3, 2020 ballot. If it is not, Plaintiffs are effectively barred from accomplishing the change they desire until after the 2030 census.

*The Signature Gathering Process in North Dakota*

28.     North Dakota's initiative and referendum provision is "self-executing." Under the North Dakota Constitution, "the people reserve the power . . . to propose and adopt constitutional amendments by the initiative[.] . . . Laws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair these powers." *See* N.D. Const. art. III, § 1.

29.     NDVF has to gather a number of petition signatures equal to at least four percent of the North Dakota resident population at the last federal decennial census, which comes to 26,904 qualified North Dakota electors. *See* N.D. Const. art. III, § 9. Initiative petitions must be filed with the Secretary of State "not less than one hundred twenty days before the statewide election at which the measure is to be voted upon." N.D. Const. art. III, § 5. The deadline for the November general election ballot in North Dakota is July 6, 2020.

30.     NDVF must abide by several requirements under North Dakota law that compel in-person signature gathering:

a. Each copy of the petition "must remain in the physical possession" of the person collecting signatures—known as the circulator.[3] The circulator must "personally witness the signature applied to the petition by each qualified elector who signs the petition"[4] and sign an affidavit stating "that the electors who have signed the petition did so in their presence." N.D. Const. art. III, § 3.

b. The circulator must sign this affidavit in presence of a Notary Public. *See* N.D. Cent. Code Ann. §16.1-01-09(1).

c. Petition signatures must be wet, not electronic. *See* N.D. Cent. Code Ann. § 16.1-01-09.

31. After the signatures are filed, Defendant must determine the sufficiency of the signatures within 35 days. *See* N.D. Cent. Code Ann. § 16.1-01-10.

<u>*The Coronavirus Pandemic Has Spread Throughout the United States and North Dakota*</u>

32. The United States and North Dakota are in a declared state of emergency as a result of a worldwide pandemic caused by a novel coronavirus. The respiratory disease caused by the virus, COVID-19, is highly contagious and can result in serious illness and death.

33. Beginning in January 2020, health experts and federal, state, and local government officials released an escalating series of warnings and emergency advisories, emphasizing the importance of protective measures including "social distancing," defined as maintaining physical space from affected or potentially affected persons.

---

[3] Secretary of State, *Initiating and Referring Law in North Dakota* 5, *available at* https://vip.sos.nd.gov/pdfs/Portals/initiating.pdf; Letter from Alvin A. Jaeger to Carol M. Sawicki 1 (Apr. 30, 2020) ("A petition left unattended is an improperly circulated petition and is not counted.").
[4] Letter from Alvin A. Jaeger to Carol M. Sawicki (Apr. 30, 2020).

34.     On January 30, 2020, the World Health Organization ("WHO") declared that the novel coronavirus constitutes a Public Health Emergency of International Concern. On January 31, President Donald Trump suspended entry into the United States by all foreign nationals who had traveled to China in the past 14 days. On February 24, 2020, President Trump asked Congress to allocate $1.25 billion for a coronavirus response.

35.     On February 25, 2020, the Director of the National Center for Immunization and Respiratory Diseases at the Centers for Disease Control and Prevention ("CDC") announced that "[d]isruption to everyday life may be severe" as a result of the virus. Regarding the spread, the Director stated that "[i]t's not so much a question of if this will happen anymore but rather more of a question exactly when this will happen," and called upon the American public to "work with us to prepare."

36.     On February 26, 2020, CDC officials stated that "[n]on-pharmaceutical interventions or NPIs will be the most important tools in our response to this virus," and that such NPIs included "social distancing measures."

37.     On February 27, 2020, the CDC issued further guidance recommending that affected local communities practice "social distancing" measures, including reducing the frequency of large gatherings and limiting the number of attendees.

38.     On March 11, 2020, the Director-General of the WHO declared COVID-19 to be a global pandemic.

39.     On March 12, 2020, the CDC updated its coronavirus-related guidance to reflect recommendations to consider cancelling or postponing mass gatherings and noting that person-to-person spread of the virus happens most frequently within a distance of six feet.

40.     On March 13, 2020, North Dakota Governor Doug Burgum issued an Executive Order declaring a State of Emergency and ordered the activation of the North Dakota State Emergency Operations Plan "in order to assist local and tribal officials, to prevent injuries and save lives, alleviate hardships, implement appropriate response and recovery actions and future mitigation measures, and facilitate restoration of services and infrastructure."[5]

41.     On March 13, 2020, President Trump declared a national emergency retroactive to March 1, 2020.

42.     On March 15, 2020, the CDC advised that no gatherings of fifty or more people should occur over the next eight weeks, including weddings, festivals, parades, concerts, sporting events, and conferences. On March 16, 2020, President Trump advised citizens to avoid groups of more than 10.

43.     On March 19, 2020, Governor Burgum issued an Executive Order mandating that restaurants, bars, breweries, cafes, and all other on-site dining establishments close to on-site patrons. The Executive Order also directed all recreation facilities, health clubs, athletic facilities and theaters, including movie theater and music or entertainment venues to close and cease operations. Finally, the Order mandated that state agencies and offices rapidly move all non-essential staff members to remote work and closed the North Dakota Capitol to visitors without an appointment. These limitations were put in place to last until April 6, 2020.[6]

---

[5] Executive Order 2020-03, https://www.fmcsa.dot.gov/emergency/north-dakota-state-emergency-executive-order-2020-03.
[6] Executive Order 2020-06, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-06.pdf.

44.     On March 22, 2020, Governor Burgum issued an Executive Order closing public and non-public K-12 schools until further notice and ordering the transition to distance learning.[7]

45.     On March 27, 2020, Governor Burgum expanded the March 19 Order to cover salons and barber shops, and tattoo, tanning, and massage facilities. He also extended the closures until April 6, 2020.[8]

46.     On March 30, 2020, Governor Burgum issued an Executive Order suspending the requirement that a physical meeting room with a speakerphone or monitor be made available to the public for meetings subject to open meetings laws being carried out remotely.[9]

47.     On April 1, 2020, Governor Burgum extended the March 19 Order, as expanded on March 27, to last until April 20, 2020.[10]

48.     On April 6, 2020, Governor Burgum issued an Executive Order suspending visitation in North Dakota long-term care facilities such as nursing facilities and basic care facilities with limited exceptions for end-of-life or compassionate care for residents with terminal conditions.[11] In the order, Governor Burgum recognized that "North Dakotans who reside in the

---

[7] Executive Order 2020-10, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-10.pdf.

[8] Executive Order 2020-06.1, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-6.1%20expanded%20business%20closures.pdf.

[9] Executive Order 2020-16, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-16.pdf.

[10] Executive Order 2020-06.2, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-06.2.pdf.

[11] Executive Order 2020-22, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-22%20-%20Suspending%20visitation%20to%20long-term%20care%20facilities.pdf.

long-term care facilities in this state are among our most vulnerable populations and particularly susceptible to complications and adverse outcomes associated with COVID-19."[12]

49.     On April 15, 2020, Governor Burgum extended the March 19 Order, as expanded on March 27, until April 30, 2020.[13]

50.     On April 29, 2020, Governor Burgum issued an Executive Order allowing health clubs, athletic facilities, movie theaters, restaurants, bars, breweries, cafes, salons, barber shops, and tattoo, tanning, and massage facilities to reopen if they adopt and follow general and industry-specific standards outlined in the Governor's ND Smart Restart Protocol.[14] These restrictions include occupancy limits (e.g. 50% capacity maximum for restaurants[15] and 20% capacity maximum for movie theaters[16]), physical distancing standards (marking six-foot increments for lines),[17] and limits on the number of people who can gather in one place (ensuring a six-foot distance between groups within businesses).[18]

---

[12] *Id.*

[13] Executive Order 2020-06.3, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-06.3%20Extending%20Restrictions%20on%20Certain%20Types%20of%20Businesses%20During%20COVID-19%20Pandemic.pdf.

[14] Executive Order 2020-06.4, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-06.4.pdf.

[15] NDResponse.gov, *Restaurants, Bars, Breweries, Distilleries, and Food Trucks*, https://ndresponse.gov/covid-19-resources/covid-19-business-and-employer-resources/nd-smart-restart/nd-smart-restart-protocols/restaurants-bars.

[16] NDResponse.gov, *Movie Theaters*, https://ndresponse.gov/covid-19-resources/covid-19-business-and-employer-resources/nd-smart-restart/nd-smart-restart-protocols/movie-theaters.

[17] NDResponse.gov, *Standards for All Industries*, https://ndresponse.gov/sites/www/files/documents/covid-19/ND%20Smart%20Restart/Standards%20for%20all%20Industries.pdf.

[18] *Id.*

51.     Under Governor Burgum's April 29 Order, recreational and sports arenas as well as music and entertainment venues must remain closed.[19]  Additionally, state employees currently teleworking are continuing to do so and state facilities remain available to the public only by appointment.[20]

52.     On May 1, 2020, Governor Burgum said that K-12 schools would remain closed and continue distance learning for the rest of the school year.[21]

53.     In response to the COVID-19 crisis, public and private colleges and universities throughout North Dakota closed, initiated online instruction measures in lieu of in-person classes, and, when possible, sent their students away from campus for the remainder of the semester. Universities have not changed course in response to Governor Burgum's April 29 Order and the ND Smart Restart plan.

      a.   The University of North Dakota (UND), North Dakota's largest university, said that "COVID-19 activity in Grand Forks County has not yet achieved levels that would allow the lifting of physical distancing precautions and restrictions on campus, in accordance with guidelines and recommendations from the Centers for Disease Control & Prevention. These precautions at UND include offering classes only online during the remainder of the Spring Semester and all of the upcoming Summer Session and restrictions on University-sponsored events. Furthermore,

---

[19] Executive Order 2020-06.4,
https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-06.4.pdf.
[20] *Id*.
[21] Burgum: K-12 schools will continue distance learning for remainder of school year as fight against COVID-19 continues (May 1, 2020), https://www.health.nd.gov/news/burgum-k-12-schools-will-continue-distance-learning-remainder-school-year-fight-against-covid.

UND employees will continue to work remotely, when possible, also continues

until further notice."[22]

b.  North Dakota State University (NDSU) released a statement that "the governor's

changes will not impact NDSU's current operations . . . NDSU will continue with

its current operating posture, including remote work arrangements. We are not

immediately changing those measures. Instead, we anticipate a ramp-up period with

various employees returning to campus in July and August depending on

responsibilities."[23]

54.    Local governments have responded to the pandemic as well. The City of Fargo

website encourages people to "[a]void discretionary travel, shopping trips and social visits,"

"[a]void social gatherings in groups of more than 10 people," refrain from visiting "nursing home

or retirement or long-term care facilities unless to provide critical assistance," to "[a]void eating

or drinking at bars, restaurants, and food courts," and to "avoid crowded places and maintain

distance from others when possible."[24] Indeed, the Fargo mayor has made clear that violating

social distancing orders can lead to fines of up to $1,000.[25] The City of Fargo is beginning to re-

open its public facilities while practicing social distancing and taking extensive safety

---

[22] University statement on North Dakota Smart Restart Plan (Apr. 29, 2020),
http://blogs.und.edu/coronavirus/2020/04/29/university-statement-on-north-dakota-smart-restart-plan/.
[23] Update from President Bresciani (Apr. 30, 2020),
https://www.ndsu.edu/police_safety/news/detail/58149/.
[24] The City of Fargo, *What can you do?*, https://fargond.gov/city-government/departments/fargo-cass-public-health/coronavirus-disease-2019-covid-19
[25] *See, e.g.,* The City of Fargo, *Stay Home, Save Lives: Directive From the Mayor* (Apr. 7, 2020), https://download.fargond.gov/0/fargo_directive_for_stay_home._save_lives..pdf ;Joshua Peguero, Fargo Mayor says you could face up to a $1,000 fine for violating social distancing rules (Apr. 15, 2020), VALLEY NEWS LIVE,
https://www.valleynewslive.com/content/news/Fargo-Mayor-says-you-could-face-a-fine-of-up-to-1000-for-violating-social-distancing-orders-569679921.html.

precautions. However, the City still maintains a "preference towards utilizing virtual formats" for necessary public meetings and "[m]embers of the public are encouraged to consider alternative means of contacting City departments, including the utilization of online resources."[26] The Fargo Public Library remains closed to the public and only began no-contact curbside pick-up on May 4, 2020.[27]

55.    Public facilities across North Dakota have closed and multiple events have been cancelled or were never scheduled.[28] Roger Maris Celebrity Golf Week has been cancelled.[29] All high school spring sports seasons and championships as well as spring fine arts regional and state contests have been cancelled.[30] The Bismarck Event Center reflects cancellations of the Dakota Garden Expo, originally scheduled for May 9–10, and all remaining Bismarck Bucks games.[31] Due to numerous cancellations and postponements, the earliest upcoming event at the FARGODOME is a concert on August 8.[32] The Fargo Marathon has also been postponed.[33]

---

[26] The City of Fargo, *City Facilities Will Be Reactivated on May 4 Utilizing "Reopening Fargo Phase One" Plan* (May 1, 2020), https://fargond.gov/news-events/city-news-room/post-detail?id=5eace3395aecb770bc651ab1.

[27] Library to Begin No-Contact Curbside Hold Pick-up on Monday, May 4 (May 1, 2020), https://fargond.gov/news-events/city-news-room/post-detail?id=5eac9f4addf546594553316a.

[28] NDtourism.com, COVID-19 Related Closures, https://www.ndtourism.com/articles/covid-19-related-closures.

[29] Inforum.com, *Roger Maris Celebrity Golf week canceled* (May 5, 2020), https://www.inforum.com/sports/golf/6479379-Roger-Maris-Celebrity-Golf-week-canceled#.XrIB2ba9hWA.twitter.

[30] North Dakota High School Activities Association, *Statement on remaining 2020 NDHSAA Winter Postseason Tournaments, Spring Sports and Fine Arts Cancellation*, https://ndhsaa.com/news/1697/statement-on-remaining-2020-ndhsaa-winter-postseason-tournaments-spring-sports-and-fine-arts-cancellation.

[31] Bismarck Even Center, *Events*, https://www.bismarckeventcenter.com/events.

[32] FARGODOME, *Buy Tickets*, https://fargodome.evenue.net/cgi-bin/ncommerce3/SEGetGroupList?groupCode=GS&linkID=global-fargo&shopperContext=&caller=&appCode=.

[33] FargoMoorhead.org, All events for Fargo Marathon – POSTPONED, https://www.fargomoorhead.org/event/fargo-marathon/all/.

56.     Courts have also limited in-person contact. This Court, for example, issued an Administrative Order on April 20, 2020 that continued all jury trials scheduled through May 31, 2020; continued all trial-specific deadlines in such continued criminal trials; suspended all hearings scheduled through May 31, 2020 with limited exceptions; provided for video or telephone conferencing for a number of hearings, proceedings and appearances through June 28, 2020; continued grand jury proceedings scheduled through May 31, 2020; and closed the United States Courthouses in Bismarck, Fargo, Minot, and Grand Forks to the public with the exception of scheduled appointments.[34]

57.     On March 17, 2020, the North Dakota Supreme Court issued Administrative Order 25 suspending civil and criminal jury trials and multi-person, in-person, compelled group meetings or hearings of specialty courts through April 24, 2020.[35] On April 15, 2020, the North Dakota Supreme Court amended its order to extend those suspensions through July 1, 2020.[36]

58.     As a result of expert warnings and advisories, recommendations from public officials, public health measures, news coverage, and the public health crisis caused by the pandemic, numerous public gatherings in North Dakota have been cancelled or postponed. Numerous categories of businesses and other public accommodations have closed or shifted to remote operation only, and will likely to remain in this state indefinitely. Even as businesses reopen, North Dakotans are likely to continue practicing social distancing. Accordingly, opportunities to encounter individuals in public spaces will continue to be drastically reduced.

---

[34] Administrative Order In re: Court Operations Under the Exigent Circumstances Created by COVID-19, https://www.ndd.uscourts.gov/announce/4-20%20COVID-19%20Order.pdf.
[35] N.D. Sup. Ct. Admin. Order 25 (Mar. 17, 2020) (amended eff. Apr. 15, 2020), https://www.ndcourts.gov/Media/Default/supreme-court/AO%2025%20emergency%20order%20amend%20apr%2015.pdf.
[36] *Id.*

*The Pandemic Has Made the In-Person Signature Gathering and Notarization Requirements*
*under North Dakota Law Unduly Burdensome*

59.     The COVID-19 pandemic makes in-person signature gathering difficult and dangerous.

60.     In normal times, collecting signatures in-person is both time and labor intensive. Collectively, circulators must make hundreds of thousands of interpersonal contacts with the general public.

61.     Circulators generally are most successful in collecting signatures at public events and large gatherings, such as sporting events, festivals, parades, and concerts, and at or near public buildings, such as libraries.  These venues provide the opportunity to encounter a large number of potential signatories in a short time frame.

62.     Circulators also depend on meeting eligible electors in front of businesses and retail locations such as banks, restaurants, movie theaters, amusement parks, and office buildings. Because of the customer traffic at these locations, canvassers can connect with large numbers of signatories, and these opportunities are vital to the signature collection process.

63.     Door-to-door collections are also difficult and dangerous during this pandemic. In light of public warnings and orders recommending social distancing, many individuals—both circulators and the people they solicit—cannot and will not risk the close contact that is necessary to provide, and to obtain, a wet signature in the presence of the circulator.

64.     Indeed, merely exchanging pens, clipboards, and petition papers back-and-forth between the circulators and the electors increases the risk of transmitting the disease.

65.     Circulators rely especially on densely populated areas to collect signatures, and NDVF had planned significant outreach in Grand Forks, Fargo, and Bismarck. The greatest

concentration of COVID-19 cases in North Dakota are in Grand Forks, Cass, and Burleigh Counties.[37]

66.     Plaintiff Sinner reasonably fears that contact with an unknown canvasser will present an undue risk of exposure and potentially adverse health effects, particularly given her severe asthma.

67.     Plaintiff Altenburg reasonably fears that contact with an unknown canvasser will present an undue risk of exposure and potentially adverse health effects, in particular for her husband who suffers from a number of chronic illnesses.

68.     Thus, Plaintiffs Sinner and Altenburg will be unable to sign a petition in support of the Proposed Amendment in a manner that satisfies both the formal requirements of North Dakota law related to the ballot initiative process, and the orders and recommendations issued by the CDC, Governor Burgum, and local officials.

69.     Plaintiff Oxendahl reasonably fears that she cannot successfully collect signatures from electors because of widespread anxiety regarding exposure to serious illness.

70.     Plaintiff Sawicki reasonably fears that she cannot successfully or safely recruit individuals who otherwise would have been willing to become circulators, because of widespread fear of exposure to serious illness.

71.     Thus, North Dakota's in-person signature requirements, as applied in the COVID-19 context, unduly burden Plaintiffs' fundamental rights, and exacerbate a public health crisis. Plaintiff NDVF cannot collect signatures for the Proposed Amendment petition or recruit or mobilize others in the manner required by North Dakota law, while also adhering to the orders

---

[37] North Dakota Health, *Coronavirus Cases*, https://www.health.nd.gov/diseases-conditions/coronavirus/north-dakota-coronavirus-cases.

and recommendations issued by the CDC, Governor Burgum, and local officials. Absent relief from this Court, Plaintiff NDVF will almost certainly be unable to collect the required 26,904 signatures by the July 6, 2020 filing deadline via the in-person collection of wet signatures.

72.     In particular, the proscription against electronic signatures, the requirement that circulators witness all signatures, and the specification that circulators swear before a Notary Public under penalty of perjury that all signatures were gathered in their personal presence, make it needlessly difficult and dangerous for Plaintiffs to obtain the required number of signatures in the midst of the current pandemic.

*The Coronavirus Pandemic Is Expected to Continue Indefinitely, Precluding Plaintiffs from Meeting the Statutory Deadline*

73.     COVID-19 continues to spread in North Dakota, with no end in sight.

74.     As of May 4, 2020, the North Dakota Department of Health reported that 1,225 positive cases of the virus have been confirmed by testing in North Dakota; twenty-five North Dakotans have died as a result of this virus.[38] As of May 5, there were 1,203,892 confirmed cases and 71,043 deaths in the United States.[39] The number is expected to continue to increase on a daily basis for the foreseeable future.

75.     While federal social distance guidelines were not extended past April 30, 2020, President Trump explained that the guidelines were not being renewed "because now the governors are doing it."[40]

---

[38] North Dakota Health, *Positive COVID-19 Test Results*, https://www.health.nd.gov/news/positive-covid-19-test-results-30.
[39] Center for Systems Science and Engineering at Johns Hopkins, *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html.
[40] Kevin Freking & Jill Colvin, *President Trump Says He Will Not Extend Federal Social Distancing Guidelines*, Time, https://time.com/5829434/trump-federal-social-distancing/.

76.     The current atmosphere created by the pandemic has made signature gathering in the regular course impossible. Furthermore, the uncertainty surrounding when the pandemic will abate has made it impossible for NDVF to plan how and when it might be able to conduct future in-person signature gathering.

<u>*North Dakota Has Already Recognized that the Pandemic Requires Changes to Previous Voting Rules*</u>

77.     On March 26, 2020, Governor Burgum issued an Executive Order intended to remain in force for the duration of the emergency, encouraging and mandating a number of actions regarding voting. This order sought "[t]o maintain the mitigating measures recommended by federal and state health officers, including the exercise of social distancing and eliminating any group gathering of more than 10 people."[41] The order:

a.  Strongly encouraged county commission boards to authorize vote by mail for the June 2020 election and establish secure mail ballot drop locations;

b.  Suspended a number of requirements regarding in-person polling places and expanded the time period in which counties can open and process mail ballots;

c.  Mandated that the Secretary of State send mail ballot application form, instructions, and return envelopes to all individuals listed in the state's Central Voter File and cover costs for those actions; and

d.  Required that at least one assistive ballot marking device be available in an accessible location in the county beginning forty days prior to the election.[42]

---

[41] Executive Order 2020-13, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-13%20Elections.pdf.
[42] *Id.*

78.    On April 2, 2020 Governor Burgum issued—and on April 7, 2020 largely reaffirmed—an Executive Order strongly encouraging North Dakota school boards to authorize vote by mail for the 2020 annual election and any school district special election, and to establish secure mail ballot drop locations. For school boards that did so, the Order lifted some polling place requirements and expanded the time period in which school board appointed election judges can open and process mail ballots.[43]

79.    Jurisdictions across the country have responded to the pandemic by changing the processes, rules, and procedures for elections and petitions to make essential adjustments to meet these extraordinary circumstances.

80.    For example, Ohio postponed their 2020 primary election until April 28, 2020. The election was conducted almost exclusively by mail and vote centers for in-person voting were only open for people who are disabled or who cannot receive mail.

81.    On March 25, 2020, a Virginia state court granted a preliminary injunction and ordered that the number of signatures needed for candidates to enter Virginia's primary election be reduced from 10,000 to 3,000. The court found that "the circumstances as they exist in the Commonwealth of Virginia and across the United States are not normal right now," and that the regulations requiring the signatures were not narrowly tailored because they "do[] not provide for emergency circumstances, like those that currently exist."[44]

---

[43] Executive Order 2020-19, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-19%20School%20Board%20Elections.pdf & Executive Order 2020-19.1, https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-19.1.pdf.

[44] *See* Order, *Faulkner v. Virginia Dep't of Elections*, Va. Cir. No. CL 20-1456 (Mar. 25, 2020), available at https://www.virginiamercury.com/wp-content/uploads/2020/03/3-25-2020-Faulkner-v.-Virginia-Department-of-Elections-CL-20-1456-Prel....pdf (accessed April 17, 2020).

82.     On April 17, 2020 the Massachusetts Supreme Judicial Court, Massachusetts' highest court, ordered three forms of relief for candidates seeking access to the ballot: first a reduction in the signature requirements by 50%, second an extension of the deadlines for filing of signatures, and third, a requirement that the Secretary of State accept electronic rather than wet-ink original signatures. The court agreed with petitioners that "these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic create an undue burden on prospective candidate's constitutional right to seek elective office."[45]

83.     On April 20, 2020 a federal court in Michigan granted a motion for preliminary injunction reducing the state signature requirement for a candidate to Michigan's Eleventh Congressional District after finding that "the State's actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access requirements operate in tandem to impose a severe burden" on the Plaintiff.[46]

84.     On April 23, 2020, a federal court in Illinois granted a motion for preliminary injunction reducing the number of signatures required for new party and independent candidates and allowing for electronic signatures after finding that "[t]he combined effect of the restrictions on public gatherings" imposed in response to COVID-19 and the state's "usual in-person signature requirements" for ballot qualification created a "nearly insurmountable hurdle" for certain candidates to qualify for the November 2020 general election ballot. *Libertarian Party of Illinois v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, *4 (N.D. Ill. Apr. 23, 2020).

85.     On April 29, 2020, the Supreme Judicial Court for Suffolk County in Massachusetts granted an Emergency Petition for Declaratory Relief permitting proponents of an initiative

---

[45] https://www.mass.gov/files/documents/2020/04/17/12931.pdf
[46] Order Granting Motion for Preliminary Injunction, *Esshaki v. Whitmer*, 2:20-cv-10831, ECF No. 23, at 4 (Apr. 20, 2020).

petition to distribute, collect, and deliver for filing both scanned copies of manually signed petitions and electronically signed petitions.[47]

<u>*Electronic Signatures Can Be Secure and Verifiable So as to Satisfy the State Interest in Ensuring the Integrity of the Petition Process*</u>

86.     The North Dakota government has identified three classifications of electronic signatures "each with an increased level of cost, integrity, authenticity, security, and non-repudiation."[48] These categories are common electronic signatures, secure electronic signatures, and digital signatures. *Id.* "The digital signature process, in conjunction with a digital certificate, uses a private key to sign and encrypt the document and a public key to de-crypt and authenticate the signature. Digital certificates are typically issued by a trusted third party that verifies facts about your identity and issues a certificate that attests to those facts." *Id.*

87.     Services like DocuSign have numerous procedures in place to ensure "comprehensive security from start to finish" including a digital audit trail, anti-tampering control, and unalterable, systematic capture of signing data.[49] The electronic signatures produced by DocuSign therefore qualify as digital signatures under the classifications identified by the state.

88.     North Dakota has already declared electronic signatures sufficient for other purposes. The North Dakota Uniform Electronic Transaction Act allows for the use of electronic signatures for contracts and other records in the state. *See* N.D. Cent. Code Ann. § 9-16. The Act dictates that a "signature may not be denied legal effect or enforceability solely because the… signature is in electronic form" and that "*[i]f a law requires a signature, an electronic signature satisfies the law*." *Id.* at § 9-16-06(1) & (4) (emphasis added).

---

[47] *See* Judgment, *Dennis et al. v. Galvin*, No. SJ-2020-278 (Apr. 29, 2020).
[48] North Dakota Information Technology, Electronic Signature Guidelines, https://www.nd.gov/itd/standards/electronic-signature-guidelines
[49] DocuSign, *Product security*, https://www.docusign.com/trust/security/product-security.

89.     The North Dakota Uniform Electronic Transaction Act also addresses electronic notarization: "[i]f a law requires a signature or record to be notarized, acknowledged, verified, or made under oath, the requirement is satisfied if the electronic signature of the person authorized to perform those acts, together with all other information required to be included by other applicable law, is attached to or logically associated with the signature or record." *Id.* at § 9-16-10.

90.     Other states have recognized the security of electronic signatures and have encouraged their use for petitions.

    a.  In response to the COVID-19 crisis, Governor Philip Murphy of New Jersey issued an executive order mandating that the Secretary of State, county clerks, and municipal clerks "accept petitions with signatures collected via an online form created by the Secretary of State."[50]

    b.  Also in response to the COVID-19 crisis, Governor Gretchen Whitmer of Michigan issued an executive order generally encouraging the use of electronic signatures,[51] and a petition campaign in Michigan has accordingly launched its digital signature gathering campaign.[52]

91.     The use of an electronic signature rather than the traditional wet signature should not interfere with the Secretary of State's regular process of verifying signatures on petitions. North Dakota statute dictates that "[t]he secretary of state shall conduct a representative random

---

[50] Executive Order No. 105, https://nj.gov/infobank/eo/056murphy/pdf/EO-105.pdf.
[51] Executive Order 2020-41, *Encouraging the use of electronic signatures and remote notarization,*
*witnessing, and visitation during the COVID-19 pandemic,*
https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-525178--,00.html.
[52] Fair and Equal Michigan, *Sign our official petition online. It takes just 1 minute.,*
https://www.fairandequalmichigan.com/sign.

sampling of the signatures contained in the petitions by the use of questionnaires, postcards, telephone calls, personal interviews, or other accepted information-gathering techniques, or any combination thereof, to determine the validity of the signatures." N.D. Cent. Code Ann. § 16.1-01-10. A petition signed with an electronic signature will still contain all of the identifying information that is used to conduct this check: the date; name; residential address or complete rural route or general delivery address; and the city, state, and zip code of the signer. The fact that the signature itself is electronic should have no impact on this process.

## CAUSE OF ACTION

## COUNT I – UNDUE BURDEN ON BALLOT ACCESS AND RIGHTS TO FREEDOM OF SPEECH AND ASSOCIATION UNDER THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

92. Plaintiffs repeat and reallege paragraphs 1 through 91 above.

93. Plaintiffs' rights to petition, speech, and association are protected by the First and Fourteenth Amendments to the United States Constitution. The circulation of petitions, including the petition for the Proposed Amendment, is "'core political speech,' for which First Amendment protection is 'at its zenith.'" *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 186 (1999) (*quoting Meyer v. Grant,* 486 U.S. 414, 422 (1988)).

94. North Dakota's in-person signature requirements—specifically, that signatures (1) be wet signatures rather than electronic signatures, (2) be collected in the physical presence of a circulator, and (3) that the circulator swear to that fact before a Notary Public—in combination with federal and state guidance and orders prohibiting certain gatherings and promoting social distancing due to COVID-19, unduly burden Plaintiffs' ability to gain access to the ballot and organize in support of the Proposed Amendment, in violation of Plaintiffs' rights under the First and Fourteenth Amendments.

95.     When analyzing the constitutionality of petition requirements, a Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review…" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).

96.     Under these circumstances, the burden on Plaintiffs' core constitutional rights is severe, operating to freeze the political status quo, exclude the Proposed Amendment from the ballot, and force Plaintiffs to effectively wait another decade for the next redistricting opportunity. Thus, the challenged North Dakota statutory and constitutional requirements applying to petitions are subject to strict scrutiny.

97.     The petition signature requirements from which Plaintiffs seek relief, as applied during the current pandemic, cannot survive strict scrutiny, because they are not narrowly tailored to serve a compelling governmental interest.

98.     Even if the challenged requirements, in light of the COVID-19 pandemic, are characterized as less than a severe burden, they still are not sufficiently justified under any level of scrutiny or balancing.

99.     Defendant has no cognizable interest in effectively barring the Proposed Amendment from the ballot. As applied in the current emergency circumstances due to the COVID-19 pandemic, the requirements of N.D. Const. art. III, § 3, §16.1-01-09 and  § 16.1-01-

10—to the extent they require (1) all signatures be wet, rather than electronic, (2) all petition signatures to be collected in the presence of the circulator, and (3) the circulator to swear to that fact in front of Notary Public—are not narrowly tailored to serve a compelling, or even legitimate, state interest, nor are they sufficiently important to justify the burdens on Plaintiffs' First and Fourteenth Amendment rights under any level of review under the current pandemic circumstances.

100.    Absent injunctive relief, Plaintiffs will suffer irreparable harm. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court enter an order:

1.    Declaring that, in the extraordinary situation presented by the coronavirus epidemic, the requirements of North Dakota law as described herein and as applied to Plaintiffs in their efforts to place the Proposed Amendment on the November 3, 2020 general election ballot, violate Plaintiffs' First and Fourteenth Amendment rights under the United States Constitution.

2.    For the November 3, 2020 general election, enjoining Defendant and his agents from enforcing, as to the Proposed Amendment brought by NDVF:

   a.  The requirement of N.D. Const. art. III, § 3 and N.D. Cent. Code Ann. §16.1-01-09(1) that each signatory signs the petition in the presence of the circulator.

   b.  The requirement of N.D. Const. art. III, § 3 and N.D. Cent. Code Ann. §16.1-01-09(1) that each circulator signs an affidavit in the presence of a Notary Public, swearing that each petitioner signed the petition in the presence of the circulator.

c. Any requirement that a petition remain in the physical possession of the circulator at all times.

d. And any other provision of North Dakota law necessary to effectuate the relief sought herein.

3. Order that the Secretary of State is required to accept the Proposed Amendment with the requisite number of electronic signatures. *See* N.D. Cent. Code Ann. § 16.1-01-10.

4. Award attorney's fees and costs associated with this litigation; and

5. Provide any additional relief the Court deems just, proper, and appropriate.

Dated: May 6, 2020                             Respectfully submitted,

                                               */s/ Timothy Purdon*
Ruth Greenwood*                                Timothy Purdon
Campaign Legal Center                          Robins Kaplan LLP
125 Cambridgepark Drive                        1207 West Divide Avenue, Suite 200
Cambridge, MA 02140                            Bismarck, ND 58501
(202) 560-0590                                 (701) 255-3000
rgreenwood@campaignlegal.org                   tpurdon@robinskaplan.com

Robert Weiner*                                 Timothy Billion
Mark Gaber*                                    Robins Kaplan LLP
Christopher Lamar*                             140 North Phillips Avenue, Suite 307
Simone Leeper*                                 Sioux Falls, SD 57104
Campaign Legal Center                          (605) 335-1300
1101 14th Street NW, Suite 400                 tbillion@robinskaplan.com
Washington, DC 20005
(202) 736-2200                                 Annabelle E. Harless*
rweiner@campaignlegal.org                      Campaign Legal Center
mgaber@campaignlegal.org                       55 W. Monroe St., Ste. 1925
clamar@campaignlegal.org                       Chicago, IL 60603
sleeper@campaignlegal.org                      (312) 312-2885
                                               aharless@campaignlegal.org

                                               *Attorneys for the Plaintiff*
                                               * Pro Hac Vice admissions forthcoming