UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Elizabeth Jane Sinner, Whitney Oxendahl, Carol Sawicki, Lois Altenburg, And North Dakota Voters First,<br><br>     Plaintiffs,<br><br>  vs.<br><br>Alvin Jaeger, in his official capacity as Secretary of State of North Dakota,<br><br>     Defendant. | **Case No. 3:20-cv-00076** |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 6**

**Self Advocacy Solutions N.D. v. Jaeger, Case No. 3:20-cv-00071, 2020 WL 2951912
(D. N.D. Jun. 6, 2020)**

2020 WL 2951012
Only the Westlaw citation is currently available.
United States District Court, D. North Dakota,
Eastern Division.

SELF ADVOCACY SOLUTIONS N.D., League of
Women Voters of North Dakota, and Maria Fallon
Romo, Plaintiffs,
v.
Alvin JAEGER, in his official capacity as Secretary
of State, and Debbie Nelson, in her official
capacity as County Auditor of Grand Forks
County, Defendants.

Case No. 3:20-cv-00071
|
Signed 06/03/2020

**Attorneys and Law Firms**

Derrick L. Braaten, Carey A. Goetz, Braaten Law Firm,
Sarah M. Vogel, Bismarck, ND, Aseem Mulji, Pro Hac
Vice, Dana Paikowsky, Pro Hac Vice, Danielle Marie
Lang, Pro Hac Vice, Mark Gaber, Pro Hac Vice,
Campaign Legal Center, Washington, DC, for Plaintiffs.

David R. Phillips, Matthew A. Sagsveen, ND Office of
the Attorney General, Bismarck, ND, for Defendant Alvin
Jaeger.

Howard D. Swanson, Swanson & Warcup, Ltd., Grand
Forks, ND, for Defendant Debbie Nelson.

**ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION**

Peter D. Welte, Chief Judge

**\*1** Due to the COVID-19 pandemic, all voters in North
Dakota's June 9, 2020 primary election will be required to
vote by mail. The Plaintiffs challenge two North Dakota
statutes that vest election officials with authority to reject
mail-in ballots based on signature discrepancies, insofar
as the statutes fail to provide affected voters with notice
and an opportunity to verify their ballots before rejection.

Now pending is the Plaintiffs' motion for preliminary
injunction filed on May 11, 2020. Doc. No. 11. On May
22, 2020, the Defendants responded in opposition to the
motion. Doc. Nos. 18, 21. The Plaintiffs filed a reply brief
on May 25, 2020. Doc. No. 22. On June 1, 2020, the
Court held a telephonic hearing on the motion. Doc. No.
27. For the reasons below, the motion is granted.

**I. BACKGROUND**
The Plaintiffs assail the omission of notice and cure
procedures from the signature-matching requirement for
absentee ballots found in North Dakota Century Code §§
16.1-07-09 and 16.1-07-12. The facts present as
straightforward. A summary of North Dakota's absentee
ballot procedures and the challenged statutes is followed
by an introduction of the parties and the procedural
history.

**A. Absentee Ballot Procedures and the
Signature-Matching Requirement**
Any eligible North Dakota voter can request an absentee
ballot. N.D. Cent. Code § 16.1-07-01. To do so, a voter
submits an application to a county official (usually the
county auditor). Id. § 16.1-07-04. The application
requires, among other things, the voter's name, date of
birth, residential address, telephone number, and an ID
number from a valid form of identification. Id. §
16.1-07-06(1). A voter must also affix a signature on the
application. Id. If unable to sign, a voter marks an "X"
and a disinterested person is required to sign the
application as a "witness to the mark." Id. §
16.1-07-06(2). After verifying an applicant's eligibility as
a qualified elector, the designated county official sends
the voter a ballot. Id. § 16.1-07-08.

The ballot arrives with a secrecy envelope, as well as a
return envelope that includes a voter affidavit on the
envelope's exterior. Doc. No. 21-3. The affidavit does not
state that a voter's signature must correspond with the
signature provided on the ballot application. See id. After
filling out the ballot, a voter slips it first into the secrecy
envelope and then into the return envelope. Doc. No.
21-1, p. 3. At that point, the voter signs and dates the
affidavit. Id. Again, if a voter is unable to sign, the voter
marks an "X" and the signature of a disinterested witness
is required. N.D. Cent. Code § 16.1-07-08(2). Then the

voter mails the ballot back to the designated county official. To be counted, the ballot must be postmarked by the day before the election and received before the county canvassing board meets on the sixth day after the election. Id. § 16.1-07-09.

When the vote-counting process begins, there are two sets of relevant election officials. The first is the election board located at each polling place. See id. § 16.1-05-01. An election board consists of one election inspector hired by the county auditor, at least two election judges appointed by the district chairs of the two political parties that received the highest number of votes in the preceding gubernatorial election, and at least two poll clerks hired by the county auditor. Id. The second is the county canvassing board, which certifies the votes submitted by the election boards. See id. § 16.1-15-15. The canvassing board is comprised of the county auditor, the county recorder, the chair of the county commission, and one representative from each of the two political parties that received the highest number of votes in the preceding gubernatorial election. Id.

**\*2** For absentee ballots received before the polls close on election day, North Dakota Century Code § 16.1-07-12 comes into operation and provides in relevant part as follows:

> At any time beginning on the day before election day and the closing of the polls on election day, the election clerks and board members of the relevant polling place first shall compare the signature on the application for an absent voter's ballot with the signature on the voter's affidavit provided for in section 16.1-07-08 to ensure the signatures correspond.... If the affidavit on the outer envelope of a returned absentee ballot is found to be insufficient, or that the signatures on the application and affidavit do not correspond, or that the applicant is not then a duly qualified elector of the precinct, the vote may not be allowed, but without opening the absent voter's envelope, the election inspector or election judge shall mark across the face thereof "rejected as defective" or "rejected as not an elector", as the case may be. These rejected

ballots are then turned over to the county canvassing board for final determination of eligibility.

If the canvassing board finds that the signatures do not correspond, the ballot is rejected. Id. § 16.1-15-19.

Absentee ballots received after the polls close on election day are forwarded directly to the county canvassing board. Id. § 16.1-07-09. The canvassing board is then tasked with determining whether "the signatures on the absentee ballot application and the voter's affidavit were signed by the same person before allowing the ballot to be tallied." Id. The voter is never notified in the event a ballot is rejected for a mismatched signature. See Doc. No. 11-12.

The North Dakota Secretary of State prepares a manual on election procedures for election officials. Doc. No. 11-5. That manual states, "If ... the signatures on the application and affidavit do not match ... the vote may not be allowed." Id. at 14. The sole guidance the manual provides on signature verification is that officials should "[c]ompare the signature on the application for the absentee ballot with the signature on the back of the absentee ballot envelope (the voter's affidavit) to ensure the signatures match." Id. Election officials receive no training in handwriting comparison. Doc. No. 1, ¶ 41. County canvassing boards do not receive guidance on signature matching beyond the basic statutory requirements. See id.

A declaration from Dr. Linton A. Mohammed, a forensic document examiner, opines that without proper training, North Dakota election officials "are likely to make erroneous signature-comparison determinations" resulting "in a significant number of erroneous rejections." Doc. No. 11-16, pp. 7, 9. Dr. Mohammed explains that persons untrained in handwriting comparison techniques are more likely to incorrectly identify signatures originating from the same person as noncorresponding than they are to incorrectly identify signatures originating from different people as corresponding. Id. at 8. He also notes the risk of error is exacerbated where only two signatures are used for comparison. Id. at 9.

As another compounding factor, the processes canvassing boards use for verifying signatures vary from county to county. See Doc. No. 11-6. Some counties simply compare applications to affidavits and conduct no further inquiry. See Doc. No. 11-7. Others consider extrinsic factors, such as a voter's situation and history. See Doc. No. 11-11. Using this approach, if a canvassing board

member happens to know a particular voter's circumstances, the canvassing board may accept the ballot. Id.

**\*3** According to a survey conducted by the United States Election Assistance Commission, North Dakota county canvassing boards rejected 334 absentee ballots for mismatched signatures in the 2018 general election. Doc. No. 11-4, p. 3. That figure represented more than 60% of all absentee ballots rejected statewide. See id. Rejection rates for signature discrepancies ranged from 0% in 27 counties to as high as 1.14% in Morton County and 1.74% in Nelson County. Id. at 2-3.

Also pertinent for the impending primary election is the impact of the COVID-19 pandemic. Ordinarily, counties must offer at least one in-person polling place for every election. N.D. Cent. Code § 16.1-11.1-01(1). Governor Doug Burgum temporarily suspended this requirement in a March 26, 2020 order. Doc. No. 11-21. Since then, each of North Dakota's 53 counties has chosen to conduct this year's primary election entirely by mail. Doc. No. 11-22.

The absentee voting process for the primary election commenced in late April. See id. In addition to voters requesting absentee ballots as usual, the Secretary of State's office mailed ballot applications to all voters listed in the state's central voter file. Doc. No. 21-1, p. 2. The central voter file complies data on those who have voted in past North Dakota elections but does not encompass all individuals who are eligible to vote. Id. As of May 21, 2020, county officials had distributed 161,256 ballots, and 39,734 voters had already submitted their ballots. Id. at 11.

### B. Introduction of Parties
The Plaintiffs are one individual and two nonprofit, nonpartisan organizations. Plaintiff Maria Fallon Romo is a regular voter and a resident of Grand Forks, North Dakota. Doc. No. 11-17, p. 2. She suffers from multiple sclerosis, which diminishes her ability to write neatly or consistently. Id. In the 2018 general election, Romo attempted to cast an absentee ballot. Id. She recently learned that election officials erroneously rejected her ballot after determining that the signature on her application did not correspond with the signature on her voter affidavit. Id. at 3. Because of the COVID-19 pandemic, Romo would be required to vote by mail for the upcoming primary. Id.

Plaintiff Self Advocacy Solutions N.D. ("SAS") is a

Grand Forks, North Dakota, nonprofit organization "dedicated to protecting the civil and human rights of people with disabilities." Doc. No. 11-19, p. 2. As part of this mission, SAS encourages people with disabilities to engage in the political process and exercise their right to vote. Id. at 3. Allen Lee Marx, Jr., President of SAS, states that the organization's members often face difficulties when attempting to vote in person, and many prefer the more convenient alternative of casting absentee ballots. Id. at 4. He points out that SAS members' disabilities can result in signature variation over time. Id. For that reason, Marx believes SAS members "are at particular risk of being deprived of their right to vote because of signatures that election [officials] deem to not 'correspond.' " Id.

Plaintiff League of Women Voters of North Dakota ("LWVND") is a Fargo, North Dakota, nonprofit organization "dedicated to encouraging informed and active participation in government, working to increase understanding of major public policy issues, and influencing public policy through education and advocacy." Doc. No. 11-20, p. 3. This work includes providing education to LWVND members and the public on voting via absentee ballot. Id. The organization's President, Jan Renae Lynch, notes that many LWVND members are elderly or have physical limitations that make writing difficult. Id. She believes those "members are at increased risk of being disenfranchised by a signature issue." Id.

**\*4** The Defendants are sued in their official capacities. Defendant Alvin Jaeger (the "Secretary") is the North Dakota Secretary of State. The Century Code prescribes the Secretary's duties for elections in chapter 16.1-01. Those duties include serving as the supervisor of elections, implementing uniform training programs for election officials, and publishing a manual on election procedures. N.D. Cent. Code § 16.1-01-01. Upon his request or the request of any election official, the Secretary holds "the power to examine ... any election ballot or other material ... for the purpose of determining sufficient compliance with the law." Id. § 16.1-01-01(1). Consistent with state election law, the Secretary is imbued with discretionary rulemaking authority to carry out his duties and to "assure uniform voting opportunities throughout the state." Id. § 16.1-01-01(3).

Defendant Debbie Nelson ("Auditor Nelson") is the County Auditor of Grand Forks County. The Century Code designates each county auditor as the "county administrator of elections." Id. § 16.1-01-01(4). County auditors are "responsible to the secretary of state for the proper administration within the auditor's county of state

laws, rules," and regulations concerning election procedures." Id. Prior to each election, county auditors must conduct training sessions on election laws and procedures for election board members. Id. § 16.1-01-01(5). As mentioned, county auditors serve as one of five members on the county canvassing board. Id. § 16.1-15-15.

### C. Procedural History

The Plaintiffs filed their complaint on May 1, 2020. Doc. No. 1. Invoking 42 U.S.C. § 1983, the complaint pleads a deprivation of procedural due process and the imposition of an undue burden on the right to vote, in contravention of the First and Fourteenth Amendments to the United States Constitution. Id. at 13-17. The complaint seeks three discrete forms of relief. First, the Plaintiffs request declaratory judgment finding the two challenged statutes unconstitutional, insofar as they fail to provide notice or an opportunity to cure a signature discrepancy before a ballot is rejected. Second, they ask for the Court to enjoin the Secretary, Auditor Nelson, and all election officials acting in concert with them from enforcing the signature-matching requirement absent adequate notice and cure procedures for the June 9, 2020 primary and future elections. And third, they request the Court to affirmatively order the Secretary to instruct county election officials to afford voters notice and an opportunity to confirm the validity of their ballots prior to rejection based on a signature mismatch. Id. at 17-18. The Defendants filed an answer to the complaint on June 1, 2020. Doc. No. 26. The Plaintiffs filed their motion for preliminary injunction on May 11, 2020, and the parties submitted timely response and reply briefs thereafter. See Doc. No. 11.

## II. STANDING

Federal courts must possess jurisdiction before reaching the merits of a case. Va. House of Delegates v. Bethune-Hill, 587 U.S. ——, 139 S. Ct. 1945, 1950, 204 L.Ed.2d 305 (2019). "Article III limits federal jurisdiction to 'Cases' and 'Controversies,' and there is no case or controversy unless the party initiating the action has standing to sue." Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp., 831 F.3d 961, 966 (8th Cir. 2016) (citing Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

Standing requires (1) an injury in fact, (2) causation, and (3) redressability. Hughes v. City of Cedar Rapids, 840 F.3d 987, 992 (8th Cir. 2016). An injury in fact is "the actual or imminent invasion of a concrete and particularized legal interest." Kuehl v. Sellner, 887 F.3d 845, 850 (8th Cir. 2018) (citations omitted). Where plaintiffs seek declaratory and injunctive relief, "they must show they are experiencing an ongoing injury or an immediate threat of injury." Webb ex rel. K.S. v. Smith, 936 F.3d 808, 815 (8th Cir. 2019) (citing Frost v. Sioux City, 920 F.3d 1158, 1161 (8th Cir. 2019)). Causation is satisfied when the injury is "fairly traceable to the action of the defendant, and not the result of the independent action of some third party not before the court." Balogh v. Lombardi, 816 F.3d 536, 543 (8th Cir. 2016) (cleaned up). Redressability is "a likelihood that the injury will be redressed by a favorable decision." Kuehl, 887 F.3d at 850 (citations omitted).

**\*5** The party invoking federal jurisdiction bears the burden to establish standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Courts "assume that on the merits the plaintiffs would be successful in their claims" when undertaking a standing analysis. Am. Farm Bureau Fed'n v. EPA, 836 F.3d 963, 968 (8th Cir. 2016) (quoting Muir v. Navy Fed. Credit Union, 529 F.3d 1100, 1106 (D.C. Cir. 2008)). The Plaintiffs "must demonstrate standing separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citations omitted). At the pleadings stage, general factual allegations suffice to support standing. See Jones v. Jegley, 947 F.3d 1100, 1104 (8th Cir. 2020). In addition to considering affidavits and other evidence in the record, the Court assumes the factual allegations in the complaint are true and construes them in the light most favorable to the Plaintiffs. See id. at 1103-04.

The Court initially addresses Romo's standing to sue. The Defendants do not contest that she meets the injury-in-fact element. And for good reason. The Plaintiffs have sufficiently pled that she is experiencing the immediate threat of injury. As alleged, Romo's multiple sclerosis, while not rendering her unable to sign her name, diminishes her ability to write neatly or consistently. Considering election officials incorrectly rejected Romo's ballot in the 2018 general election for a signature discrepancy—coupled with the fact that she will again have to vote by mail in the upcoming primary because of the COVID-19 pandemic—there is a realistic threat of an impending deprivation of her right to vote. Romo satisfies the first standing requirement.

The Defendants vigorously contest causation and redressability, however. They divert any fault for Romo's threatened injury toward local election boards and county canvassing boards as the entities that make the ultimate determinations on whether a ballot is rejected for a signature discrepancy. This tactic is unavailing.

"When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." Dig. Recognition Network, Inc. v. Hutchinson, 803 F.3d 952, 957-58 (8th Cir. 2015) (cleaned up). In tandem, suits for declaratory and injunctive relief against state officials raise the specter of Eleventh Amendment state sovereign immunity. See Calzone v. Hawley, 866 F.3d 866, 869 (8th Cir. 2017). Under the Ex parte Young exception to Eleventh Amendment immunity, a sued official must have "some connection with the enforcement of the act" to be a proper defendant. 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908). "[A] state official's requisite connection with the enforcement of a statute may arise out of 'the general law' or be 'specially created by the act itself.' " Calzone, 866 F.3d at 870 (quoting Ex parte Young, 209 U.S. at 157, 28 S.Ct. 441). The Ex parte Young inquiry is analogous to the causation requirement for Article III standing. See id. at 869; Citizens for Equal Prot. v. Bruning, 455 F.3d 859, 864 (8th Cir. 2006), abrogated on other grounds, Obergefell v. Hodges, 576 U.S. ——, 135 S. Ct. 2584, 192 L.Ed.2d 609 (2015).

Causation at the pleading stage is a "relatively modest" burden and is not a mandate that a defendant's conduct be "the very last step in the chain of causation." Bennett v. Spear, 520 U.S. 154, 169, 171, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). That means the causation requirement "does not exclude injury produced by determinative or coercive effect upon the action of someone else." Id. at 169, 117 S.Ct. 1154. To that effect, "an injury may be indirect and still be sufficient to confer standing so long as that injury is fairly traceable to the defendant's acts or omissions." Belles v. Schweiker, 720 F.2d 509, 514 (8th Cir. 1983) (citation and internal quotation marks omitted).

*6 In this instance, the named Defendants possess at least some authority to enforce the signature-matching requirement directly. The Secretary, for example, holds "the power to examine ... any election ballot or other material ... for the purpose of determining sufficient compliance with the law." N.D. Cent. Code § 16.1-01-01(1). Auditor Nelson sits as one of five members on the canvassing board for Grand Forks

County.

Moreover, both officials play central roles in enforcing the challenged statutes through subordinates. The Secretary serves as the state's supervisor of elections and is statutorily required to implement uniform training programs for election officials. This includes the preparation of an election procedures manual, which instructs election board members that voters' ballots "may not be allowed" based on mismatched signatures. Doc. No. 11-5, p. 14. The manual no doubt has a "determinative or coercive effect" on the actions of election officials. Bennett, 520 U.S. at 169, 117 S.Ct. 1154. In a similar vein, Auditor Nelson is the election supervisor at the county level "responsible to the secretary of state for the proper administration within the auditor's county of state laws, rules, and regulations concerning election procedures." N.D. Cent. Code § 16.1-01-01(4). She is tasked by statute with hiring and overseeing the election officials that make the initial determination on whether to reject a ballot based on a signature mismatch. Auditor Nelson is also required to conduct training sessions with all election officials in Grand Forks County to ensure compliance with election protocols. These facts illustrate that the Defendants possess the requisite connection with the challenged statutes' enforcement, rendering the risk of injury to Romo fairly traceable to their conduct.

The Plaintiffs further emphasize that the threat of injury to Romo results from more than the rote enforcement of the signature-matching requirement. In particular, they decry the failure to adopt notice and cure procedures. This allegation places the ball squarely in the Secretary's court. North Dakota law authorizes the Secretary to engage in rulemaking consistent with state election law to "assure uniform voting opportunities throughout the state." Id. § 16.1-01-01(3). And persuasively, the Century Code already mandates the Secretary to "establish a uniform procedure for county auditors to follow when notifying a military or overseas voter that the voter's absentee ballot was rejected." Id. § 16.1-07-17. Assuming the Plaintiffs would prevail on the merits of their claim, sufficient facts assign the Secretary responsibility to establish, and county auditors to implement, notice and cure procedures. The assertion that Romo's threatened injury stems from the failure to adopt adequate procedures is therefore traceable to the Defendants. See Belles, 720 F.2d at 514 (finding plaintiff's indirect injury traceable to defendant government agency based on allegation of failure to provide procedures for notice and opportunity to respond). Romo clears the "relatively modest" burden to establish causation at the pleadings stage. Bennett, 520 U.S. at 171, 117 S.Ct. 1154.

Self Advocacy Solutions N.D. v. Jaeger, --- F.Supp.3d ---- (2020)

Moving to redressability, an order enjoining the Defendants (as well as election officials acting in concert with them) from rejecting mail-in ballots based on signature discrepancies in the absence of adequate notice and cure procedures is likely to redress the threatened injury to Romo. The same is true for an affirmative order requiring the Secretary to instruct county auditors to implement such procedures for the upcoming primary election. Redressability is present.

**\*7** In opposition, the Secretary leans heavily on a recent decision from the Eleventh Circuit Court of Appeals. In Jacobson v. Florida Secretary of State, 957 F.3d 1193 (11th Cir. 2020), the court held that the plaintiffs lacked standing in a suit challenging a ballot-ordering statute. The appeal occurred following a bench trial. Id. at 1198. The statute at issue required the names of candidates from the political party that won Florida's most recent gubernatorial election to appear first on the general election ballot, with candidates from the second-place party in the most recent gubernatorial election appearing second. Florida law tasked the state's 67 county supervisors with determining ballot ordering. The Eleventh Circuit determined that the individual county supervisors were the proper defendants, not the Florida Secretary of State. Id. at 1209-10. The court's reasoning in denying standing rested on two primary grounds: (1) Florida's county supervisors were independent elected officials not accountable to the Secretary of State, and (2) a directive from the Secretary of State instructing the supervisors to alter the ballot ordering would not have redressed the plaintiffs' injuries because the supervisors were still bound to follow the letter of the statute. Id. at 1207-08.

Jacobson is distinguishable in several critical aspects. At the outset, the burden to establish standing increases successively with the burden of proof at each stage of litigation. Lujan, 504 U.S. at 561, 112 S.Ct. 2130. Whereas the Jacobson plaintiffs were forced standing commensurate with the burden of proof at trial, here the Plaintiffs need only support standing with general factual allegations—a significantly less exacting standard. Next, North Dakota's county auditors lack the degree of independence afforded to Florida's county supervisors. County auditors are expressly "responsible to" the Secretary when carrying out election-related duties. N.D. Cent. Code § 16.1-01-01(4). This also alleviates the redressability problem in Jacobson. County auditors are subordinate to the Secretary in election matters, and nothing in North Dakota law overtly prohibits the implementation of notice and cure procedures for mismatched signatures in the mail-in ballot verification

process. The Court concludes Jacobson is inapplicable.

In sum, Romo meets the necessary standing elements at this early juncture. This obviates the need to consider SAS or LWVND's standing because "where one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial to jurisdiction." Jones v. Gale, 470 F.3d 1261, 1265 (8th Cir. 2006) (cleaned up). The Court will therefore proceed to the merits.[1]

## III. PRELIMINARY INJUNCTION

Rule 65(a) of the Federal Rules of Civil Procedure authorizes district courts to grant preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). When considering a motion for preliminary injunction, the Court weighs the four factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc). The Dataphase factors include: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 114. While no one factor is dispositive, the likelihood of success on the merits is most important. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011). The balance of harms and public interest factors merge when the government is the opposing party. Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). The burden to demonstrate the necessity of a preliminary injunction rests with the movant. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

### A. Likelihood of Success on the Merits

**\*8** The Plaintiffs proffer two distinct constitutional violations. First, they assert the signature-matching requirement, without adequate notice and cure procedures, contravenes their Fourteenth Amendment right to procedural due process. Second, they contend the same regime imposes an undue burden on their right to vote as protected by the First and Fourteenth Amendments. The Court addresses only the asserted procedural due process violation because the Plaintiffs are likely to succeed on that claim, affording complete relief

as a result. See Saucedo v. Gardner, 335 F. Supp. 3d 202, 222 (D.N.H. 2018).

As an initial matter, the Secretary asserts that the Plaintiffs cannot mount a successful facial challenge.[2] "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." Bucklew v. Precythe, 587 U.S. ——, 139 S. Ct. 1112, 1127, 203 L.Ed.2d 521 (2019). Relying on Crawford v. Marion County Election Board, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), the Secretary contends the signature-matching requirement in not amenable to facial attack because it burdens a limited number of North Dakota voters. While certainly applicable to constitutional claims predicated on an undue burden on the right to vote, Crawford is not a barrier to procedural due process claims. See Saucedo, 335 F. Supp. 3d at 222 (enjoining signature-matching statute for procedural due process violation without discussing Crawford); Martin v. Kemp, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018) (same). Further, when confronting a facial challenge, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." City of Los Angeles v. Patel, 576 U.S. 409, 135 S. Ct. 2443, 2451, 192 L.Ed.2d 435 (2015). Here, the statutes are restrictions only on voters whom election officials identify as providing noncorresponding signatures. The Plaintiffs lodge a proper facial challenge.[3]

Turning to the merits, the Fourteenth Amendment familiarly forbids a state actor to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Amendment includes both procedural and substantive components. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). To prevail on a procedural due process claim, a plaintiff must establish (1) a constitutionally protected interest, and (2) a deprivation of that interest without due process of law. See Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

Beyond debate, the right to vote is a constitutionally protected liberty interest. See Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (citation omitted) (declaring that "voting is of the most fundamental significance under our constitutional structure"). Although "the right to apply for and vote via absentee ballot is not constitutionally on par with the fundamental right to vote," a state that creates a system for absentee voting "must administer it in accordance with the Constitution." Martin, 341 F. Supp. 3d at 1338 (quoting Zessar v. Helander, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006)). The importance of this principle is even more evident where, as here, an

absentee ballot is the sole available voting method. Consequently, the Plaintiffs possess a constitutionally protected interest.

*9 The question now becomes whether the challenged statutes facially effect a deprivation of the right to vote without due process. "The essential requirements of due process ... are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Because there is no possibility of meaningful postdeprivation process when a voter's ballot is rejected (there is no way to vote after an election is over, after all), sufficient predeprivation process is the constitutional imperative. See Winegar v. Des Moines Indep. Cmty. Sch. Dist., 20 F.3d 895, 901 (8th Cir. 1994). On this front, North Dakota's signature-matching requirement is wholly deficient. Voters are simply never notified or afforded any opportunity to respond if election officials reject their ballots for a signature discrepancy. This all but ends the inquiry.

Nonetheless, the Secretary contends that two predeprivation safeguards supply sufficient process—the ability to mark an "X" on the ballot application and voter affidavit in lieu of a signature, and the two-tier review system for signature mismatches. The contention that adequate process is afforded necessitates consideration of the balancing test articulated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Under that test, courts weigh three factors: "(1) the private interest that will be affected by the state action; (2) the risk of erroneous deprivation of that interest through the procedures used, and the value of any additional or substitute procedures; and (3) the state's interest." Porter v. Knickrehm, 457 F.3d 794, 798 (8th Cir. 2006) (citation omitted).

The Court finds these factors tip decisively in the Plaintiffs' favor. The private interest at stake is the fundamental right to vote, so this first factor is "entitled to substantial weight." Martin, 341 F. Supp. 3d at 1338. North Dakota's decision to allow voting via absentee ballot requires the state to administer the system constitutionally. See id.

For the second factor, the risk of error is significant when the only mechanism available to prospectively stave off deprivation is the ability to mark an "X" on the ballot application and voter affidavit. The Secretary asserts that voters should know the law requires signatures to correspond, and if they are aware of the possibility that their signatures may not match, then they should utilize the alternative accommodation. This argument is devoid

of merit. Neither the application nor the affidavit inform voters that signatures must correspond for their ballot to count. See Doc. No. 21-3. The Secretary cannot seriously expect voters to comb through the Century Code in search of a requirement they have no reason to believe exists. Equally important, the alternative accommodation is intended for voters "unable" to sign their name. N.D. Cent. Code §§ 16.1-07-06(2), 16.1-07-08(2). So following the Secretary's logic, voters are charged with not only knowing whether they are able to produce consistent signatures, but also with knowing that such inconsistency renders them entirely "unable" to sign their name. In essence, the Secretary expects voters to read the minds of election officials before deciding to affix a signature on an absentee ballot. That cannot be the process due.

Furthermore, Dr. Mohammed's declaration convincingly demonstrates that the two-tier review system by the election boards and canvassing boards is similarly inadequate to provide due process. He opines that without proper training in handwriting comparison, North Dakota election officials are more likely accept invalid absentee ballots than to erroneously reject valid absentee ballots. Dr. Mohammed also sets out a host of reasons that the same voter's signature may vary over time and identifies a particularly high risk of error where only two samples are used for comparison. The result is the outright disenfranchisement of otherwise qualified electors. The value of additional procedures to safeguard against erroneous ballot rejections therefore becomes apparent. Attempting to contact voters and allowing an opportunity to verify ballots ensures compliance with the bare-minimum requirements of procedural due process. The second factor favors the Plaintiffs.

**\*10** Addressing the third factor, the state's interest does not outweigh the value of the additional notice and cure procedures that protect the fundamental right to vote. To be sure, the state holds important interests in preventing voter fraud and upholding the integrity of elections. See Crawford, 553 U.S. at 191-92, 128 S.Ct. 1610. But allowing voters to verify the validity of their ballots demonstrably advances—rather than hinders—these goals. As the Secretary notes, the purpose of the signature-matching requirement is to ensure the same person that signed the ballot application is the person casting the ballot. Notice and cure procedures do exactly that by confirming the validity of legitimate voters' ballots, preventing voter fraud and increasing confidence in our electoral system in the process.

And any fiscal or administrative burden is miniscule when compared to the palpable threat of disenfranchisement. In the 2018 general election, half of North Dakota's 53

counties did not reject a single ballot for a signature discrepancy, meaning there would often be no increased burden on county election officials. Doc. No. 11-4, pp. 2-3. The highest number of rejections for signature mismatches came from Burleigh County (the second-most populous county in the state) at 51, while Grand Forks County (Auditor Nelson's county) rejected a mere 21. Id. Attempting to contact this limited number of voters in the time between the day before election day, when the signature comparison process begins, and six days after election day, when the county canvassing boards convenes, is far from an insurmountable endeavor. Additionally, county auditors are already familiar with contacting voters that submit absentee ballots with missing information, so corresponding with voters regarding ballot errors is not uncharted territory. N.D. Cent. Code § 16.1-07-10. The state's interest is insufficient to overshadow the private interests at stake and the benefit of constitutionally necessary procedures.

The signature-matching requirement found in North Dakota Century Code §§ 16.1-07-09 and 16.1-07-12 is likely facially unconstitutional, insofar as the statutes fail—under all circumstances—to provide affected voters with notice and an opportunity to cure a signature discrepancy before a ballot is rejected. Accordingly, the Court finds the Plaintiffs have established a substantial likelihood of success on the merits of their procedural due process claim.

### B. Remaining Preliminary Injunction Factors
The Plaintiffs successfully carry the burden on the three remaining preliminary injunction factors as well. The second factor, irreparable harm, is clearly met. There is also no possibility of monetary relief. And if a ballot is wrongly rejected for a signature mismatch, the voter is irreversibly disenfranchised for that election. See Fla. Democratic Party v. Detzner, Case No. 4:16cv607-MW/CAS, 2016 WL 6090943, at \*8 (N.D. Fla. Oct. 16, 2016) (citation omitted) (noting in the election context, "this isn't golf: there are no mulligans").

For the combined balance of harms and public interest factors, the Defendants begin by pointing out that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Maryland v. King, 567 U.S. 1301, 1301, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers) (cleaned up). Though true, the Court finds that the harm to the state is outweighed by the harm inherent in the deprivation of the Plaintiffs'

fundamental right to vote. See Martin, 341 F. Supp. 3d at 1340. Indeed, an injunction will not prevent the state from enforcing the signature-matching requirement, but rather will require enforcement to comply with the Constitution.

The Defendants offer two other theories in opposition to a preliminary injunction on public harm and interest grounds that warrant discussion. They contend that first, the Plaintiffs waited too long to file both this action and the present motion, and second, that the Court should not enjoin the enforcement of the challenged statutes this close to the June 9, 2020 primary election. Taking each argument in turn, the Court is unpersuaded.

**\*11** "[A] party requesting a preliminary injunction must generally show reasonable diligence." Benisek v. Lamone, 585 U.S. ——, 138 S. Ct. 1942, 1944, 201 L.Ed.2d 398 (2018). The Court acknowledges that the Plaintiffs' decision to file this case and the accompanying preliminary injunction motion when they did increases the harm to the Defendants to some degree. The condensed timeline for formulating and implementing relatively new procedures for the impending primary election is less than ideal. Still, the Court does not find that a lack of diligence, if any exists, bars injunctive relief here. Auditor Nelson highlights a March 2019 email from the Barnes County Auditor to the Plaintiffs' counsel that demonstrated an awareness of the omission of notice and cure procedures from the signature-matching requirement. See Doc. No. 11-12. While that email may show knowledge of the potential claim itself, it is not indicative of a failure to timely pursue injunctive relief. At oral argument, the Plaintiffs' counsel indicated that the decision to seek a preliminary injunction arose when the COVID-19 pandemic forced the June primary to transform into an exclusively vote-by-mail election, inflating the importance of the signature-matching requirement. Governor Burgum issued the order suspending the in-person polling place requirement on March 26, 2020, and the Plaintiffs' filed their complaint 36 days later on May 1, 2020. See Doc. Nos. 1, 11-21. This motion followed ten days later. See Doc. No. 11. In these circumstances, the Court cannot say the Plaintiffs lacked diligence in pursuing injunctive relief.

Likewise, the Court is not convinced that the Plaintiffs' requested injunctive relief runs afoul of the admonition "that lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. ——, 140 S. Ct. 1205, 1207, —— L.Ed.2d —— (2020). That admonition derives from Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), a case addressing Arizona's voter identification laws. There, the Supreme

Court held that federal courts must weigh "considerations specific to election cases" when deciding whether to enjoin an election law in close temporal proximity to an election. Id. at 4, 127 S.Ct. 5. Immediately following that holding, the opinion explained, "Court orders affecting elections ... can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." Id. The concerns that troubled the Supreme Court in Purcell are not present in this instance. A voter filling out an absentee ballot will be entirely unaffected by an order enjoining the signature-matching requirement—a requirement that applies only after a ballot is submitted. In other words, there is no potential for voter confusion or dissuasion from voting because the process for submitting an absentee ballot will remain unchanged. To the extent the impact on election officials alone is relevant under Purcell, the Court has previously weighed that impact and found the countervailing threat of the deprivation of the fundamental right to vote more significant.

The Plaintiffs have established that the balance of harms and public interest factors favor a preliminary injunction. As a final note, the Court deems statewide relief the appropriate course of action because the two challenged statutes are likely facially unconstitutional in the absence of adequate notice and cure procedures. Cf. Brakebill v. Jaeger, 932 F.3d 671, 678 (8th Cir. 2018).

## IV. <u>CONCLUSION</u>

The Court has reviewed the record, the parties' filings, and the relevant legal authority. The Plaintiffs have met the burden to demonstrate the necessity of a preliminary injunction. For the reasons above, the Plaintiffs' motion for preliminary injunction (Doc. No. 11) is **GRANTED**. The Court **ORDERS** as follows:

(1) The Secretary, Auditor Nelson, and all North Dakota election officials acting in concert with them are hereby enjoined from rejecting any mail-in ballot on the basis of a signature mismatch absent adequate notice and cure procedures for the June 9, 2020 primary election. In the event this matter has not been finally resolved on the merits prior to the November 3, 2020 general election, the Plaintiffs may apply for additional injunctive relief.

(2) The parties shall confer and submit to the Court no later than 12:00 P.M. on Friday, June 5, 2020 proposed procedures to be implemented by county auditors that afford affected voters notice when a ballot is identified

Self Advocacy Solutions N.D. v. Jaeger, --- F.Supp.3d ---- (2020)

as containing a signature mismatch, as well as an opportunity for affected voters to verify their ballots.

**\*12 IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 2951012

Footnotes

1    Auditor Nelson raised a laches defense in her brief. At oral argument, her counsel indicated that the laches theory is intended to challenge the Plaintiffs' diligence in pursuing injunctive relief and not as a bar to the action outright. As a result, the Court will address the laches argument under the balance of harms factor for the preliminary injunction analysis.

2    Notwithstanding the Plaintiffs' argument to the contrary, the Court construes their claims as facial challenges. The complaint expressly seeks declaratory judgment finding North Dakota Century Code §§ 16.1-07-09 and 16.1-07-12 unconstitutional in the absence of notice and cure procedures, and the requested relief does not focus on the application of the statutes to individual Plaintiffs.

3    The Court does not address the Secretary's arguments regarding a perceived as-applied challenge from Romo, because neither the complaint nor the Plaintiffs' preliminary injunction motion requests individualized relief.

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.