IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Elizabeth Jane Sinner, Whitney Oxendahl, Carol Sawicki, Lois Altenburg, and North Dakota Voters First, <br><br> Plaintiffs, <br><br> vs. <br><br> Alvin Jaeger, in his official capacity as Secretary of State of North Dakota, <br><br> Defendant. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** <br><br> Case No. 3:20-cv-00076 |

In 1914, the people of North Dakota attained direct power to amend their state constitution. Doc. No. 17-2. Prerequisite to placing an amendment before the electorate, that constitution has mandated—for 106 years running—the collection of physical signatures from a threshold contingent of eligible voters. See id. Stressing the impact of the COVID-19 pandemic, the Plaintiffs now seek an exemption from that requirement to secure a spot for a proposed amendment on the November 3, 2020 general election ballot.

Before the Court is the Plaintiffs' motion for preliminary injunction filed on May 7, 2020. Doc. No. 4. On May 20, 2020, Defendant Alvin Jaeger (the "Secretary") responded in opposition to the motion. Doc. No. 17. The Plaintiffs filed a reply brief on May 22, 2020. On June 4, 2020, the Court held a hearing on the motion. Doc. No. 30. For the reasons below, the motion is denied.

I.  **BACKGROUND**

The Plaintiffs challenge several North Dakota constitutional and statutory provisions pertaining to the initiated amendment process that collectively require: (1) petition signers to provide wet signatures; (2) petition circulators to personally witness each signature; and (3)

petition circulators to swear before a notary public that they witnessed the signatures on each petition. See N.D. Const. art. III, § 3; N.D. Cent. Code § 16.1-01-09(2). The Plaintiffs also request an order directing the Secretary to accept electronic signatures for their petition. Summaries of the initiated constitutional amendment process and North Dakota's response to the COVID-19 pandemic are followed by an introduction of the parties and the procedural history.

### A.  Initiated Constitutional Amendment Process

Article III of the North Dakota constitution affirms that "the people reserve the power . . . to propose and adopt constitutional amendments by the initiative." N.D. Const. art. 3, § 1; accord id. § 9. The "article is self-executing and all of its provisions are mandatory." Id. Additional "[l]aws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair" the people's initiative power. Id.

At a basic level, constitutional amendment proponents must collect signatures from four percent of the state's population at the last federal decennial census. Id. § 9. Currently, that equates to 26,904 signatures. Doc. No. 17-6, p. 5. The deadline to submit petition signatures to the Secretary is "not less than [120] days before the statewide election at which the measure is to be voted upon." N.D. Const. art. 3, § 5. The cutoff for the upcoming general election is July 6, 2020. Doc. No. 17-6, p. 7.

The initiated measure process commences with the formation of a sponsoring committee comprised of at least 25 eligible voters. N.D. Const. art. 3, § 2. The sponsoring committee submits a proposed petition to the Secretary for preliminary "approval as to form." Id. When a proposed petition is received, the Secretary is tasked with preparing "a short and concise statement that fairly represents the measure." N.D. Cent. Code § 16.1-01-09(1). That statement is referred to as the petition title. Id. The Secretary's draft petition title is transmitted to the attorney general for

ultimate approval or disapproval.  Id.  In total, the initial petition review can take no less than five and no more than seven business days.  Id.  The Secretary then returns the proposed petition to the sponsoring committee with a memorandum outlining corrections, if needed.  Doc. No. 17-1, p. 3.  Upon submission of a revised petition, the Secretary conveys a letter to the sponsoring committee approving the petition for circulation.  Id.  Measure proponents may circulate a petition for a maximum of one year following approval.  N.D. Cent. Code § 16.1-01-09(7).

For the signature gathering process itself, North Dakota law provides, "Every qualified elector signing a petition shall do so in the presence of the individual circulating the petition."  Id. § 16.1-01-09(2).  The statute does not permit electronic petition signatures.  See id.  Guidance for initiated measure proponents issued by the Secretary additionally states that "a petition must remain in the physical possession of [a] qualified North Dakota circulator and all signatures obtained must be witnessed by the same. . . . Circulators should be near and in control of petitions as they are being signed."  Doc. No. 17-6, p. 6.  Signatures on an unattended petition are subject to disqualification.  See id.  After collecting signatures, petition circulators must swear "that the electors who have signed the petition did so in their presence" by executing an affidavit before a notary public.[1]  N.D. Const. art. 3, § 3.

Once the requisite number of signatures is obtained, the sponsoring committee submits the petition to the Secretary for final approval.  Doc. No. 17-1, p. 4.  The Secretary engages in a detailed verification process that includes mailing postcards to random petition signatories and conducting follow-up phone calls.  Doc. No. 17-15, pp. 2-4.  The signature review process may not exceed 35 days.  N.D. Cent. Code § 16.1-01-10.  In the past, the Secretary has uncovered

---

[1] The circulator's affidavit is attached to the last page of each petition.  Doc. No. 17-1, p. 4.  North Dakota voters ratified the notarization requirement in the 1978 general election.  Id.

fraudulent activity when reviewing physical petition signatures. Doc. No. 17-1, p. 5. Unlawfully signing or circulating an initiative petition is a criminal offense. N.D. Cent. Code § 16.1-01-12. Following review, if the Secretary determines the signature threshold is met, he notifies the sponsoring committee that the measure will appear on the ballot. Doc. No. 17-1, p. 5.

### B.     Response to the COVID-19 Pandemic

On March 13, 2020, Governor Doug Burgum declared a state of emergency in response to the COVID-19 pandemic. Doc. No. 5-2. A host of executive orders ensued that mandated the closure or restricted operation of businesses, schools, government offices, entertainment venues, and recreational and sports arenas. See Doc. Nos. 5-3, 5-5, 5-7 to 5-10. The Governor also suspended visitation to nursing homes and other long-term care facilities. Doc. No. 5-13. Another order modified voting procedures for the June 9, 2020 primary election by waiving the usual in-person polling place requirement and encouraging counties to shift to an entirely vote-by-mail election. Doc. No. 5-6.

Unlike some states, however, North Dakota never implemented a so-called stay-at-home order. And since May 1, 2020, the Governor has revoked nearly all the previously imposed pandemic-related restrictions.[2] See Doc. Nos. 5-15, 17-19, 29-1. Replacing the waning legal prohibitions, North Dakota has issued comprehensive guidelines based on risk level that urge citizens and businesses to adopt physical distancing, sanitization, and mask-wearing protocols to prevent the spread of COVID-19. See ND Smart Restart Protocols, N.D. Response, https://ndresponse.gov/covid-19-resources/covid-19-business-and-employer-resources/nd-smart-

---

[2] The Court takes judicial notice that the Governor issued an executive order on June 5, 2020 resuming limited visitation at nursing homes and long-term care facilities. See Executive Orders, Office of the Governor, https://www.governor.nd.gov/executive-orders (last visited June 12, 2020).

4

restart/nd-smart-restart-protocols (last visited June 12, 2020). On May 29, 2020, the Governor downgraded the state's risk level from "moderate" to "low." See id. At that risk level, the recommendations call for restaurants and bars to limit occupancy to 75% of capacity and for large events not to exceed 500 people. Id. at 11-12. Vulnerable individuals are encouraged to "[u]se caution; avoid large crowds when communities have resurgence of cases." Id. at 12. To date, North Dakota has reported 3,016 total confirmed COVID-19 cases and 74 resulting deaths. See Coronavirus Cases, N.D. Dep't of Health, https://www.health.nd.gov/diseases-conditions/ coronavirus/north-dakota-coronavirus-cases (last visited June 12, 2020).

### C. Introduction of Parties

The Plaintiffs are one organization and four individuals that support placing a proposed constitutional amendment on the November 3, 2020 general election ballot. Among other objectives, the proposed amendment aims to create a nonpartisan legislative redistricting process. Doc. No. 1, ¶ 3. Redistricting occurs once every ten years during the legislative session immediately following a federal census. See id. ¶ 6. North Dakota's next legislative redistricting is slated to take place during the 2021 legislative session. See id. In practical effect, if the Plaintiffs' proposed amendment is voted on subsequent to the 2020 general election, any change in the redistricting process could not be implemented until after the 2030 census. Id.

North Dakota Voters First ("NDVF") is a 501(c)(4) organization that acts as the proposed amendment's sponsoring committee. Doc. No. 5-1, p. 2. NDVF submitted a proposed petition for initial approval on March 6, 2020. Doc. No. 17-9. The Secretary returned the petition along with the petition title and corrections on March 17, 2020. Doc. No. 17-10. On April 29, 2020, NDVF submitted a revised petition, which the Secretary approved for circulation the next day. Doc. No. 17-11.

From May 26, 2020 to May 30, 2020, NDVF conducted a pilot project for in-person signature collection in Fargo. Doc. No. 28. The pilot project incorporated enhanced precautions for the protection of canvassers and the public. Id. The precautions included wearing gloves and masks, utilizing disposable pens, checking canvassers' temperatures regularly, and employing social distancing efforts. Id. In five days, NDVF collected 2,387 signatures. Id. On June 1, 2020, NDVF decided to proceed in earnest with signature gathering in Fargo, Grand Forks, Bismarck, and Minot using the precautions implemented during the pilot project. Id.

The four individual Plaintiffs are politically engaged Fargo residents who wish to either sign the petition or canvass for the proposed amendment. Carol Sawicki is NDVF's Chair. Doc. No. 5-1, p. 2. Sawicki planned to circulate the petition herself but decided against doing so because of the pandemic. Id. at 3. She is also concerned that NDVF will have difficulty recruiting volunteer canvassers and convincing qualified voters to sign the petition. Id. Whitney Oxendahl is a volunteer canvasser for the NDVF initiative. Doc. No. 5-18, p. 2. Oxendahl states that she "would not feel comfortable approaching strangers who may not want to be approached, but such contact is necessary to obtain a signature on a petition." Id. Lois Altenburg is on NDVF's sponsoring committee. Doc. No. 5-19, p. 2. She wants to sign the petition and witness her husband's signature, but because of age and her husband's health conditions, she has limited her contact with other people since mid-March. Id. at 2-3. Elizabeth Jane Sinner would like to sign the petition as well. Doc. No. 5-20, p. 2. Due to age and health concerns, however, she is strictly adhering to social distancing practices. Id.

The Secretary is the lone Defendant. North Dakota law designates the Secretary as the state's chief election officer. N.D. Cent. Code § 16.1-01-01. As explained, he is responsible for

approving petitions for circulation and verifying compliance with the signature, witnessing, and notarization requirements. See id. §§ 16.1-01-09, 16.1-01-10.

### D. Procedural History

The Plaintiffs filed their complaint on May 6, 2020. Doc. No. 1. Invoking 42 U.S.C. § 1983, the complaint seeks declaratory judgment finding the challenged provisions violate the Plaintiffs' First Amendment and Fourteenth Amendment rights under the circumstances presented by the COVID-19 pandemic.[3] In addition, the complaint requests an injunction that simultaneously bars the Secretary from enforcing the in-person signature, witnessing, and notarization requirements and affirmatively mandates that he accept electronic signatures for the Plaintiffs' petition. Id. at 28-29. On May 28, 2020, the Secretary filed an answer to the complaint. Doc. No. 26. The Plaintiffs moved for a preliminary injunction on May 7, 2020, and the parties filed timely response and reply briefs thereafter. See Doc. No. 4.

## II. DISCUSSION

Rule 65(a) of the Federal Rules of Civil Procedure authorizes district courts to grant preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). When considering a motion for preliminary injunction, the Court weighs the four factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc). The Dataphase factors include: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the

---

[3] The Plaintiffs clarified at oral argument that they lodge a single claim for violation of their First Amendment speech and association rights as incorporated against the states by the Fourteenth Amendment. To the extent the Plaintiffs raise a separate due process challenge, precedent clearly forecloses that avenue of relief. See Hoyle v. Priest, 265 F.3d 699, 702 (8th Cir. 2001).

probability that movant will succeed on the merits; and (4) the public interest." Id. at 114. Likelihood of success on the merits is the most important factor. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011). The burden to demonstrate the necessity of a preliminary injunction rests with the movant. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

      **A.**      **Likelihood of Success on the Merits**

Petition circulation is "core political speech" for which First Amendment protection is "at its zenith." Meyer v. Grant, 486 U.S. 414, 422, 425 (1988). States that authorize citizen-initiated legislation may not regulate the process in a manner that unduly restricts political discussion. Dobrovolny v. Moore, 126 F.3d 1111, 1113 (8th Cir. 1997) (citation omitted).

      1.      Applicability of the First Amendment

As an initial roadblock, the Secretary asserts that the in-person signature, witnessing, and notarization requirements do not implicate the First Amendment at all. Analogizing to Dobrovolny and Hoyle, the Secretary contends that these regulations, while admittedly making ballot access more difficult, do not restrain political speech. Not so. The constitutional provision contested in Dobrovolny set the number of signatures required for placement of an initiative on the ballot. 126 F.3d at 1113. And the constitutional provision in Hoyle mandated that only registered voters could sign petitions. 265 F.3d at 703. In both cases, the Eighth Circuit Court of Appeals deemed First Amendment protection inapplicable because "the requirement[s] in no way impeded the supporters of a measure from circulating a petition or from expressing their views." Id. at 704; see also Wellwood v. Johnson, 172 F.3d 1007, 1009 (8th Cir. 1999). By contrast, the combined effect of the laws challenged here is to circumscribe the way initiative supporters circulate petitions and express their political views. See John Doe No. 1 v. Reed, 561 U.S. 186, 195 (2010) ("Petition

8

signing remains expressive even when it has legal effect in the electoral process."). Thus, the in-person petition requirements create at least some restriction on political speech.

Alternatively, the Secretary avers that the absence of state action dooms the claim because it is the COVID-19 pandemic, rather than him or any other state official, that has prevented the Plaintiffs from circulating or signing a petition. But as other courts have recently determined, the relevant state action in this instance is the Secretary's continued enforcement of the in-person signature, witnessing, and notarization requirements. See Fair Maps Nev. v. Cegavske, Case No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018, at *8 (D. Nev. May 29, 2020). The pandemic is immaterial to the threshold state action question. Had the Plaintiffs challenged application of the same laws in the 2018 general election, the state action still would have been the Secretary's enforcement of the in-person petition requirements. The pandemic might alter the burden the regulations impose, but that is a separate question from whether state action affects First Amendment freedoms in the first place. See Thompson v. Dewine, 959 F.3d 804, 810 (6th Cir. 2020) (considering the effect of state action in analysis of burden on First Amendment rights).

In sum, the challenged laws limit political discussion to some degree, and the Secretary's continued enforcement supplies sufficient state action. That is enough to trigger First Amendment protection.

2. Anderson-Burdick Test

With that established, "no litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions." Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 183 (1999) (cleaned up). Instead, the pliable Anderson-Burdick test supplies the proper legal framework when a ballot initiative regulation is challenged on First Amendment grounds. See Initiative & Referendum Inst. v. Jaeger, 241 F.3d 614, 616 (8th Cir. 2001). Under that test:

9

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Burdick v. Takushi, 504 U.S. 428, 434 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)). This inquiry calls for "a case-by-case assessment of the burdens and interests affected by . . . a ballot access scheme in its totality." Libertarian Party of N.D. v. Jaeger, 659 F.3d 687, 693 (8th Cir. 2011). "Severe burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling state interest, whereas lesser burdens receive a lower level of review." Initiative & Referendum Inst., 241 F.3d at 616 (citing Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358-59 (1997)).

      a.    *Burden on First Amendment Rights*

In Meyer, the Supreme Court identified two potential types of burdens on political expression arising from state regulation of petition circulation. The first occurs when a ballot-access scheme "limits the number of voices that will convey [Plaintiffs'] message . . . and, therefore, limits the size of the audience they can reach." Meyer, 486 U.S. at 422-23. And the second materializes when a regulatory regime "makes it less likely that [Plaintiffs] will garner the number of necessary signatures, thus limiting their ability to make the matter the focus of statewide discussion." Id. at 423. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." Schmitt v. LaRose, 933 F.3d 628, 639 (6th Cir. 2019) (citation omitted).

Turning initially to NDVF's claim, North Dakota's in-person signature, witnessing, and notarization requirements do not severely limit the number of voices able to convey NDVF's message or, concomitantly, the size of the audience initiative proponents can reach. The petition requirements themselves in no way restrict backers of NDVF's initiative from canvassing or

10

voicing their support.  And differing from many states, North Dakota never implemented a stay-at-home order.  None of the Governor's executive orders even tangentially prohibited signature collection.  See Thompson, 959 F.3d at 809-10 (determining similar Ohio in-person signature requirements created less than a severe burden where pandemic restrictions did not limit First Amendment activity).  Nor do the state's advisory pandemic guidelines present a significant obstacle to signature gathering.  At this juncture, the guidelines call for restricted capacity in certain venues but otherwise generally allow for the kind of social activity that facilitates signature collection and the expression of political views.  The combined effect of the in-person petition requirements and North Dakota's pandemic response imposes a less-than-severe burden on NDVF's ability to reach voters.

Without state-sanctioned restrictions on canvassing, the Plaintiffs essentially ask the Court to declare on its own that in-person signature gathering is unsafe during the pandemic.  But federal courts make poor arbiters of public health.  Such decisions are instead best left "to the politically accountable officials of the States," not "an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  S. Bay United Pentecostal Church v. Newsom, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (mem.) (Roberts, C.J., concurring in the denial of injunctive relief) (citation omitted).  Over the past three months, North Dakota officials have responded to a rapidly evolving and unprecedented crisis with carefully calibrated policy decisions that touch nearly every aspect of daily life, including election processes.  Those decisions no doubt rested on scientific data and recommendations from public health experts.  Concluding now that state officials did not go far enough by omitting to waive the in-person petition requirements—relying on little more than briefs from lawyers—would venture beyond the bounds of this Court's authority.

The Plaintiffs have likewise failed to demonstrate that the in-person petition requirements will result in the virtual exclusion of NDVF's proposed amendment from the ballot. In its own pilot project, NDVF gathered 2,387 signatures in just five days in one city. Doc. No. 28. That represents over 8% of the total signatures required for placement on the ballot. Although the precautions NDVF has chosen to implement increase the burden on canvassers, garnering the requisite number of signatures is far from impossible. See Thompson, 959 F.3d at 810 (noting that "just because procuring signatures is now harder . . . doesn't mean that Plaintiffs are *excluded* from the ballot").

Further, even assuming the pandemic's impact on in-person signature gathering created a severe burden for NDVF beginning in March, strict scrutiny still is not warranted here. That is so because the Anderson-Burdick framework mandates analysis of a ballot-access scheme as a whole. See Libertarian Party of N.D., 659 F.3d at 693. Critically, North Dakota law allows for circulation of a petition for up to one year following approval. N.D. Cent. Code § 16.1-01-09(7). Despite knowing that the 2020 general election presented the final opportunity to implement legislative redistricting reform for the next decade, NDVF waited until four months before the July 6, 2020 signature deadline to submit a proposed petition. After the Secretary returned the petition with corrections, NDVF waited another month and a half before submitting its revised petition, leaving a mere 67 days to gather signatures. Doc. No. 17-1, p. 4. So NDVF's predicament is largely attributable to its own delay.[4]

---

[4] Two district court cases rejected delay arguments, but in both instances the plaintiffs had already gathered at least 60% of their signatures before restrictive stay-at-home orders stymied further progress. See Sawarimedia LLC v. Whitmer, Case No. 20-cv-11246, 2020 WL 3097266, at *9 (E.D. Mich. June 11, 2020); Esshaki v. Whitmer, 2:20-CV-10831-TGB, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020).

To be clear, the Court in no way faults NDVF for failing to account for the onset of an entirely unpredictable pandemic. But North Dakota's in-person petition requirements—considered in totality—cannot impose a severe burden on First Amendment rights as applied to NDVF when the pandemic will present an obstacle for, at most, one-third of the time statutorily available for signature collection. See Morgan v. White, Case No. 20 C 2189, 2020 WL 2526484, at *6 (N.D. Ill. May 18, 2020) ("Plaintiffs have not established that it is state law, rather than their own 16-month delay, that imposes a severe burden on their First Amendment rights, even in the context of the COVID-19 pandemic."); Arizonans for Fair Elections v. Hobbs, No. CV-20-00658-PHX-DWL, 2020 WL 1905747, at *12 (D. Ariz. Apr. 17, 2020) ("[H]ad Plaintiffs simply started gathering signatures earlier, they could have gathered more than enough to qualify for the ballot before the COVID-19 pandemic started interfering with their efforts."). As the Secretary aptly points out, any number of unpredictable events can hamper signature gathering efforts, ranging from bad weather to economic downturns. The Plaintiffs took a calculated risk in waiting to submit a proposed petition until the last four months of the last possible election for a once-in-a-decade reform measure. The Court declines to intervene at the eleventh hour by subjecting decades-old constitutional and statutory provisions to strict scrutiny—provisions that the Plaintiffs concede complied with the First Amendment in less turbulent times. "Considering all opportunities Plaintiffs had, and still have, to exercise their rights . . . [the] burden is less than severe." Thompson, 959 F.3d at 810.

Similarly, any burden on the four individual Plaintiffs' associational rights is moderate. Again, neither legal impediments nor state health guidelines prevent canvassing or signing initiative petitions. Moreover, NDVF's own efforts show that collecting signatures in compliance with social distancing recommendations is feasible. If the individual Plaintiffs choose not to

13

partake in canvassing for NDVF or decide not to sign the petition, those are voluntary decisions not traceable to North Dakota's in-person petition requirements. The Court "cannot hold private citizens' decisions to stay home for their own safety against the State." Id. Because the Plaintiffs fall short in demonstrating that the burden on their First Amendment rights is severe, a "lower level" of constitutional review applies. Initiative & Referendum Inst., 241 F.3d at 616.

      b.    *Justifying State Interests*

To survive this less exacting review, North Dakota's "asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the [Plaintiffs'] rights." Green Party of Ark. v. Martin, 649 F.3d 675, 685 (8th Cir. 2011) (citations and internal quotation marks omitted). A state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Timmons, 520 U.S. at 358 (cleaned up).

Applying these principles, North Dakota holds unquestionably important interests in preventing fraud and protecting the integrity of the electoral process. See Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 196 (2008); Eu v. San Francisco Cty. Democratic Cent. Comm., 489 U.S. 214, 231 (1989). The in-person petition requirements advance these goals by ensuring petition signatories are qualified electors. Supporting this notion, the Secretary explains that he has discovered fraudulent activity when reviewing physical petition signatures during his tenure in office. Doc. No. 17-1, p. 5.

For their part, the Plaintiffs attempt to show that the acceptance of electronic signatures will not significantly change the Secretary's signature review process or diminish the ability to detect fraud. But that is purely speculative, especially considering the myriad challenges attendant with adopting an untested method for signature collection on a condensed timeline. See Miller v. Thurston, No. 5:20-CV-05070, 2020 WL 2617312, at *10 (W.D. Ark. May 25, 2020) (noting a

failure to show parity between the verification of electronic and physical petition signatures); Doc. No. 17-21 (stating that the Plaintiffs "fail to explain in any practical detail how electronic signature solutions such as DocuSign could be utilized for the large scale collection of petition signatures and submission to the [Secretary] for review"). Lastly, the Plaintiffs assail the in-person petition requirements as superfluous for fraud prevention, noting that unlawfully signing or circulating an initiative petition is already a crime. Even so, the in-person signature, witnessing, and notarization requirements serve a purpose distinct from any collateral criminal penalties because they charge canvassers with prophylactically preventing fraud. See Munro v. Socialist Workers Party, 479 U.S. 189, 195 (1986) ("Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively. . . .").

All in all, North Dakota's important interests in preventing fraud and protecting the integrity of the electoral process outweigh any burden on the Plaintiffs' First Amendment rights. Consequently, the Plaintiffs cannot establish a substantial likelihood of success on the merits.

### B. Remaining Preliminary Injunction Factors

Because the Plaintiffs are unlikely to succeed on their First Amendment claim, consideration of the remaining Dataphase factors is unnecessary. See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 737 (8th Cir. 2008) (en banc). Nonetheless, the Court will touch on them briefly.

Irreparable harm is absent for many of the same reasons that render the Plaintiffs' success on the merits improbable. See Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (finding no irreparable harm where plaintiff was unlikely to succeed on First Amendment claim); Swift Power Servs., LLC v. N. Country Constr. & Rentals, Inc., Case No. 4:12-cv-108, 2013 WL 12085489, at *4 (D.N.D. Jan. 7, 2013) (explaining that "a movant for a preliminary injunction does not satisfy

the irreparable harm criterion when the alleged harm is self-inflicted"). In turn, the balance of harms and public interest factors favor the Secretary. Enjoining a state from enforcing laws enacted by the people's representatives—and here, constitutional provisions approved by the people themselves—amounts to a well-recognized variant of irreparable injury. See Maryland v. King, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). Enforcement of duly enacted laws advances the public interest as well. Ass'n of Equip. Mfrs. v. Burgum, Case No. 1:17-cv-151, 2017 WL 8791104, at *11 (D.N.D. Dec. 14, 2017).

### III. CONCLUSION

The Court has reviewed the record, the parties' filings, and the relevant legal authority. The Plaintiffs are unlikely to succeed on the merits of their First Amendment claim, obviating the need for a preliminary injunction. Accordingly, the motion (Doc. No. 4) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 15th day of June, 2020.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court